Ricky Lee **FULCHER**, Appellant,

v.

**COMMONWEALTH of Kentucky,**
Appellee,

and

**Ricky Lee Fulcher, Appellant,**

v.

**Commonwealth of Kentucky, Appellee.**

No. 2002–SC–0855–MR,
2002–SC–0879–MR.

Supreme Court of Kentucky.

Nov. 18, 2004.

As Modified on Denial of Rehearing
Dec. 6, 2004.

**366**

Emily Holt, Department of Public Advocacy, Frankfort, Counsel for Appellant.

Gregory D. Stumbo, Attorney General, George G. Seelig, Assistant Attorney General, Criminal Appellate Division, Frankfort, Counsel for Appellee.

Opinion of the Court by Justice COOPER.

Following a trial by jury in the Logan Circuit Court, Appellant, Ricky Lee Fulcher, was convicted of two counts of manufacturing methamphetamine, KRS 218A. 1432(1); two counts of possession of anhydrous ammonia in an unapproved container with intent to manufacture methamphetamine, KRS 250.489(1), KRS 250.991(2); two counts of possession of drug paraphernalia, KRS 218A.500(2); and one count of possession of marijuana, KRS 218A. 1422. The conviction of possession of marijuana and one each of the convictions of the three other offenses were obtained pursuant to Indictment No. 01–CR–157, which stemmed from a search of Appellant's residence and property on July 24, 2001. The other three convictions

were obtained pursuant to Indictment No. 01–CR–179, which stemmed from a search of Appellant's residence and property on August 3, 2001. The indictments were jointly tried. RCr 9. 12; *Harris v. Commonwealth,* Ky., 556 S.W.2d 669, 669–70 (1977). However, for purposes of sentencing, the offenses occurring on August 3, 2001, were treated as subsequent offenses, *i.e.,* the convictions of manufacturing methamphetamine and possession of anhydrous ammonia in an unapproved container were enhanced from Class B felonies to Class A felonies, KRS 218A. 1432(2); KRS 250.991(2), and the conviction of possession of drug paraphernalia was enhanced from a Class A misdemeanor to a Class D felony, KRS 218A.500(5).

Appellant was sentenced to thirty years imprisonment and appeals to this Court as a matter of right. Ky. Const. § 110(2)(b). He asserts that (1) there was insufficient evidence to convict him of either manufacturing methamphetamine or possession of anhydrous ammonia; (2) the trial court erroneously instructed the jury on the offense of manufacturing methamphetamine so that he was denied his right to a unanimous verdict; (3) the constitutional proscription against double jeopardy was violated in two respects: (a) the trial court's instructions on manufacturing methamphetamine and possession of anhydrous ammonia in an unapproved container with the intent to manufacture methamphetamine caused him to be convicted twice of the same offense, and (b) the convictions of separate offenses occurring on July 24, 2001, and August 3, 2001, were premised upon the same evidence; (4) the trial court erred in permitting a witness to testify to prior misconduct by Appellant in violation of RCr 7.26(1), KRE 401(b), and KRE 401(c); and (5) the offenses occurring on August 3, 2001, were not "subsequent offenses" for purposes of subsequent offense enhancement.

## I. SUFFICIENCY OF THE EVIDENCE.

### A. Indictment No. 01–CR–157.

On July 24, 2001, an unidentified caller reported to the Russellville Police Department that two Caucasian males had robbed a boy and fired a weapon at him in the vicinity of Cave Springs Road in Logan County, Kentucky. Law enforcement units from the Kentucky State Police, the Logan County Sheriff's Office, and the Auburn Police Department began searching for the two men. While driving down Gasper River Road, some of the officers passed Appellant's residence and noticed a number of people standing in the yard, all of whom, upon observing the marked police vehicles, immediately ran into the woods behind the residence. While giving chase, the officers noticed two marijuana plants growing in Appellant's back yard and the scent of ammonia emanating from an open window in the residence. Unable to obtain a response to knocks on the door of the residence, the officers sought and obtained a search warrant for the residence and surrounding property.

While the officers were awaiting arrival of the search warrant, Appellant emerged from the residence claiming to have been asleep. The officers ordered him to remain outside until after the warrant was executed. One of the persons who had run into the woods, David Harrison, was apprehended but not charged. Six others, C.J. Anderson, Johnnie Finn, Kandi Finn, Andrea Freeman, Jody Cherry, and Matthew Jones, voluntarily returned to the residence and were subsequently arrested.

At trial, the Commonwealth played,

without objection,[1] a videotape produced by the Drug Enforcement Agency (DEA) which described and demonstrated how methamphetamine is illegally manufactured by the ephedrine reduction method, sometimes referred to as the "Nazi method" because the Nazis used the method to manufacture methamphetamine for distribution to Wehrmacht soldiers during World War II. That is the method of manufacturing methamphetamine Appellant allegedly employed. Thus, the videotaped description of that method explains the significance of what was discovered during the search of Appellant's residence and property.

According to the videotape's narrator, the primary precursors of methamphetamine are ephedrine or pseudoephedrine, anhydrous ammonia, and sodium metal or lithium. Ephedrine and pseudoephedrine are active ingredients in common antihistamine tablets. To separate the ephedrine or pseudoephedrine from the corn starch and cellulose, binding agents used to hold the active ingredients together in tablet form, the tablets are first ground into powder and soaked in denatured alcohol or methanol. The ephedrine or pseudoephedrine dissolves in the alcohol, leaving the binding agents as a kind of "sludge," or "pill dough," that sinks to the bottom of the container. The alcohol mixture is then funneled through coffee filters into a heat-resistant glass bowl, usually "Corningware" or "Pyrex." The "pill dough" remains in the coffee filters and is discarded. The glass bowl is then heated until the alcohol evaporates, leaving a pure ephedrine or pseudoephedrine powder.

Sodium metal or lithium strips are then mixed into the powder. A wooden or plastic spoon is usually used for mixing because a metal utensil might cause an undesired chemical reaction. Anhydrous ammonia is then funneled into the mixture from, typically, a propane tank through a plastic tube or rubber hose. Application of the anhydrous ammonia to the mixture causes a chemical reaction that converts the ephedrine or pseudoephedrine into base methamphetamine. After the anhydrous ammonia evaporates, water is added to the mixture which reacts with the residual lithium and converts it into sodium hydroxide (lye). Ether is then added to dissolve the base methamphetamine and separate it from the sodium hydroxide. The methamphetamine/ether mixture is then funneled through coffee filters into another glass container, leaving the sodium hydroxide (and some methamphetamine residue) in the filters. The jar containing the methamphetamine/ether mixture is then connected by plastic tubing to a homemade hydrogen chloride gas "generator," usually a plastic gasoline container or a container of the type in which ketchup or dishwashing liquid is commercially sold. Sulfuric acid and common salt are mixed in the "generator" to create hydrogen chloride gas that passes through the tubing into the glass container and causes the methamphetamine to separate from the ether into a powdery form that sinks to the bottom of the container. The liquid ether is then drained off through coffee filters to leave the finished product of methamphetamine. These coffee filters, like the ones used to drain off the sodium hydroxide, will also contain some methamphetamine residue. There was evidence at trial that additional methamphetamine can be obtained by placing the coffee filters containing methamphetamine residue

1. *But see Fields v. Commonwealth*, Ky., 12 S.W.3d 275, 279–82 (2000) (audio portion of videotape is hearsay).

in a glass container and "cooking" them with hydrogen chloride gas from the "generator."

Based on the videotape and other evidence introduced at trial, the following chemicals would normally be required to manufacture methamphetamine by the "Nazi method": (1) ephedrine or pseudoephedrine, found in common antihistamine tablets; (2) anhydrous ammonia, commonly used in agriculture as a fertilizer and obtained (usually stolen) from farms or farm supply stores where it is kept outside in pressurized tanks; (3) sodium metal or, more commonly, lithium, which can be removed from commercially sold lithium batteries; (4) denatured alcohol, commonly found in commercial products such as "Coleman Fuel," or methanol, commonly found in automobile anti-freeze products; (5) ether, commonly found in automobile starting fluid products; (6) sulfuric acid, commonly found in commercial drain-cleaning products; and (7) common salt. The required equipment includes: (1) mixing bowls, including at least one heat-resistant bowl; (2) a device to crush the antihistamine tablets into powder form (the videotaped demonstration used a blender but, presumably, a hammer would suffice); (3) a stirring device, e.g., a wooden or plastic spoon (though the videotape did not rule out the use of other similar devices); (4) glass jars, usually Mason jars; (5) plastic funnels; (6) plastic tubing or rubber hose; (7) filters, usually coffee filters; (8) a storage container for anhydrous ammonia (usually a modified propane tank); (9) if lithium is used instead of the more volatile sodium metal, vise grips or pliers or some similar device to pry open the lithium batteries; and (10) a plastic or glass container for use as a hydrogen chloride "generator."

The July 24, 2001, search of Appellant's property was conducted by four Kentucky State Police officers. Outside Appellant's residence they found (1) the two marijuana plants; (2) two plastic containers containing "pill dough;" a "burn pile" containing (3) several empty punctured Prestone starting fluid cans (the ether is removed by puncturing the bottom of the can), (4) several empty Coleman Fuel cans; (5) two boxes filled with used coffee filters; (6) a glass container containing used coffee filters and three layers of liquid attached by plastic tubing to a sealed ketchup bottle which was "cooking" the liquid in the glass container, i.e., gas was then passing from the ketchup bottle through the plastic tubing into the glass container causing the liquid contents of the container to bubble; and (7) an altered propane tank fitted with a copper valve that had turned a bluish-green color (often caused by a chemical reaction with anhydrous ammonia) and containing a small amount of liquid that field-tested positive for anhydrous ammonia. After field-testing the contents of the propane tank, the officers disabled the tank from future use by puncturing it with bullet holes. The officers concluded that the ketchup bottle attached to the bubbling glass jar was a hydrogen chloride "generator" that was "cooking" the coffee filters in the jar in order to extract the methamphetamine residue remaining from an earlier filtering process. The three layers in the bubbling jar consisted of a powdery substance at the bottom, a salty liquid substance in the middle, and a clear substance at the top. The contents of all three layers subsequently tested positive for methamphetamine.

Inside the residence, the officers found (1) a bottle of denatured alcohol on the bar in the living room and (2) an aluminum foil "boat," a device commonly used in smoking methamphetamine, in the bedroom. The "boat" contained burn marks (the methamphetamine is placed on the "boat," which is then heated so that the fumes can be

inhaled). In the kitchen, the officers found (3) two funnels and (4) a Mason jar, as well as cans of (5) Liquid Fire and (6) Coleman Fuel, and (7) a glass jar in the refrigerator containing ether. They also found what they believed to be (8) a bowl of liquid anhydrous ammonia in the deep freeze. The odor emanating from this bowl was the odor that had first attracted their attention and prompted them to obtain the search warrant. The officers diluted the substance in the bowl and poured it onto the ground without testing it.

Following the search, Appellant was arrested and charged with manufacturing methamphetamine, possession of anhydrous ammonia in an unapproved container with intent to manufacture methamphetamine, possession of drug paraphernalia, and possession of marijuana. He posted bond and was released.

■ Comparing the chemicals and equipment described on the DEA videotape as being required for the manufacture of methamphetamine with the chemicals and equipment found during the search on July 24, 2001, we conclude that there was insufficient evidence to convict Appellant of manufacturing methamphetamine under KRS 218A. 1432(1)(b) (possessing the chemicals or equipment) because he did not possess *all* of the chemicals or *all* of the equipment needed for the manufacture of methamphetamine. *Kotila v. Commonwealth,* Ky., 114 S.W.3d 226, 237 (2003). Even assuming that the presence of "pill dough" was circumstantial evidence that he had possessed ephedrine or pseudoephedrine, *see Varble v. Commonwealth,* Ky., 125 S.W.3d 246, 254 (2004) (possession of empty Sudafed blister packs and empty propane tanks from which anhydrous ammonia odor emanated was circumstantial evidence of the possession of pseudoephedrine and anhydrous ammonia in the recent

past), the search team did not find any sodium metal or lithium, chemicals necessary for the manufacture of methamphetamine. They also did not find any mixing bowls, a stirring device, such as a wooden or plastic spoon, or any pliers, vise grips, or similar device necessary to extract lithium from lithium batteries, equipment necessary for the manufacture of methamphetamine.

■ However, the evidence was sufficient to support a conviction under KRS 218A. 1432(1)(a) (actual manufacture). KRS 218A. 1431(1) defines "manufacture" as "the production, preparation, propagation, compounding, conversion, or processing of methamphetamine ...." The operation of the homemade generator that was separating the methamphetamine residue from the used coffee filters satisfied the "processing" aspect of this definition.

■ The evidence was also sufficient to support a conviction of possessing anhydrous ammonia in an unapproved container with the intent to manufacture methamphetamine. Although the liquid anhydrous ammonia found in the freezer was not tested, the contents of the propane tank field-tested positive for anhydrous ammonia and Detective Scotty Ward testified that the charge of possessing anhydrous ammonia in an unapproved container was based on the anhydrous ammonia found in the propane tank, not the contents of the bowl found in the freezer. The trial judge ruled as a matter of law that a propane tank is not an approved container for anhydrous ammonia and that ruling is not challenged on appeal. The fact that a manufacturing process was ongoing at the time of the search and that numerous other chemicals and items of equipment used in the manufacture of methamphetamine were found nearby, created a reasonable inference that Appellant intended to use the anhydrous ammonia to manufacture

methamphetamine. *Anastasi v. Commonwealth,* Ky., 754 S.W.2d 860, 862 (1988) (intent can be inferred from conduct and surrounding circumstances). The evidence was sufficient to support Appellant's conviction of the offense. *Commonwealth v. Benham,* Ky., 816 S.W.2d 186, 187 (1991).

B. *Indictment No. 01–CR–179.*

On August 1, 2001, Jody Cherry, one of the persons arrested on Appellant's property on July 24, 2001, signed a criminal complaint accusing Appellant of twice threatening to kill him. On August 3, 2001, Captain Wallace Whitaker and Deputy Steve Stratton of the Logan County Sheriff's Office proceeded to Appellant's residence to serve him with arrest warrants for terroristic threatening. Upon their arrival, they saw the same altered propane tank that the state police officers had disabled on July 24, 2001. They also detected a strong odor that Stratton believed was "ammonia or ether." Based on the presence of this odor and the altered propane tank, the officers obtained a warrant to search Appellant's residence and property.

During the search inside the residence, the officers discovered (1) two plastic containers with powder in the bottom that were still smoking, and two empty plastic liquid dishwasher bottles that had been fitted with tubing and that were still emanating gas. Stratton opined that these items had recently been used as homemade generators to separate methamphetamine from ether during the last stage of the manufacturing process. They also found (2) a rubber hose; (3) salt; and (4) a glass jar containing fluid that later tested positive for the presence of methamphetamine; as well as (5) rolling papers; (6) a piece of burnt aluminum foil; (7) a Berez torch that could be used to heat the foil for smoking methamphetamine or to cook the denatured alcohol off of the powdered

ephedrine or pseudoephedrine; and (8) pipes and syringes with burn residue. In addition, they found (9) a glass jar containing a liquid substance that was emanating an odor that Stratton identified as the odor of anhydrous ammonia, as opposed to, *e.g.,* diluted (aqueous) household ammonia. He also testified that anhydrous ammonia is a hazardous material and that law enforcement procedures in place at that time prohibited its storage or transport to a laboratory. Because the sheriff's office did not possess equipment to field-test the substance, Stratton diluted it with water and poured it onto the ground.

Outside the residence, the officers located a burn pile containing (1) punctured Prestone starting fluid cans and (2) rubber hose. Under the hood of a junked car, they located (3) a bag full of lithium strips. Based on these findings, they charged Appellant with manufacturing methamphetamine, possession of anhydrous ammonia in an unapproved container with intent to manufacture methamphetamine, and possession of drug paraphernalia.

■ The items recovered during the August 3, 2001, search were insufficient to support a conviction of manufacturing methamphetamine under KRS 218A. 1432(1)(b) (possessing the chemicals or equipment). The officers did not find any evidence of the presence of ephedrine or pseudoephedrine, or denatured alcohol (assuming that the empty Prestone starting fluid cans were circumstantial evidence of the recent presence of ether and the remains of the homemade generator was circumstantial evidence of the recent presence of sulfuric acid). *Varble,* 125 S.W.3d at 254. Thus, Appellant did not possess all of the chemicals necessary to manufacture methamphetamine. *Kotila,* 114 S.W.3d at 237. Nor was he in possession of all of the equipment necessary to manufacture methamphetamine. *Id.* Specifically, the

officers did not find a blender (or even a hammer), a mixing bowl, a heat-resistant bowl, a funnel, a wooden or plastic spoon, or a pair of pliers or vise grips.

■ However, the evidence was sufficient to support a conviction under KRS 218A. 1432(1)(a) (actual manufacture). In addition to finding a glass jar containing liquid that tested positive for methamphetamine, indicating that methamphetamine had, indeed, been recently manufactured, the officers found glass containers and plastic dishwashing liquid bottles that were still "smoking," indicating that the manufacturing process had been taking place almost immediately before the officers entered the residence.

■■ The evidence was also sufficient to support Appellant's conviction of possession of anhydrous ammonia in an unapproved container with the intent to manufacture methamphetamine. KRS 250.482(3) applies the proscription in KRS 250.489(1) to anhydrous ammonia in either its compressed or liquefied form but not to aqueous ammonia. Stratton testified that, based on his training and experience, the odor emanating from the liquid in the glass jar found in Appellant's residence was that of anhydrous ammonia, not diluted (aqueous) household ammonia.

> A nonexpert witness may express an opinion which is rationally based on the perception of the witness and helpful to a determination of a fact in issue. KRE 701. A corollary to this rule is the concept known as the "collective facts rule," which permits a lay witness to resort to a conclusion or an opinion to describe an observed phenomenon where there exists no other feasible alternative by which to communicate that observation to the trier of fact.

*Clifford v. Commonwealth*, Ky., 7 S.W.3d 371, 374 (1999). In *King v. Ohio Valley Fire & Marine Ins. Co.*, 212 Ky. 770, 280 S.W. 127 (1926), a witness was allowed to testify that he detected the odor of gasoline at the scene of a fire. Our predecessor court held:

> The plaintiff contends that those things were conclusions of the witness, and that he should merely have described the odor, and should not have given his conclusion that he could smell gasoline. Technically, perhaps, that should have been done, but the average man would have great difficulty in telling just how coal oil or gasoline smells, though acquainted with their odors, and perhaps the best description the witness could give was to say he knew their odors, and he could smell coal oil, or he could smell gasoline.

*Id.*, 280 S.W. at 130. These same principles apply to Stratton's testimony in this case.

■ On a motion for directed verdict, the court must draw all fair and reasonable inferences in favor of the Commonwealth, as questions of credibility and weight of the evidence are matters for the jury. *Benham*, 816 S.W.2d at 187. A reasonable jury could have believed from Stratton's testimony that the substance in the glass jar found in Appellant's residence on August 3, 2001, was anhydrous ammonia. *United States v. Morrison*, 207 F.3d 962, 966 (7th Cir.2000) (odor of anhydrous ammonia in residence was sufficient circumstantial evidence that defendant possessed anhydrous ammonia; "The evidence of anhydrous ammonia is especially probative because its scent is easily recognizable . . . and out of place in a residence."); *cf. Varble*, 125 S.W.3d at 254 (odor of anhydrous ammonia emanating from two air tanks and evidence that discoloration of brass fittings was likely caused by anhydrous ammonia was circumstantial evidence that the tanks had contained anhy-

drous ammonia in the recent past). The trial judge ruled as a matter of law that a glass jar is not an approved container for anhydrous ammonia. And, as with the anhydrous ammonia found during the July 24th search, the presence of numerous other chemicals and items of equipment used to manufacture methamphetamine permitted an inference that Appellant possessed the anhydrous ammonia with the intent to manufacture methamphetamine. With respect to the fact that the contents of the glass jar were destroyed without testing, the trial judge gave the jury a "missing evidence" instruction that permitted the jury to infer that if the evidence were available, it would be favorable to Appellant's case. *Collins v. Commonwealth*, Ky., 951 S.W.2d 569, 573 (1997).

## II. GUILT PHASE INSTRUCTIONS.

The jury instruction for the offense of manufacturing methamphetamine on July 24, 2001, was as follows:

> You will find the Defendant guilty of Manufacturing Methamphetamine under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt that in this county on or about the 24th day of July, 2001, he manufactured methamphetamine or possessed a glass jar containing ether, a quantity of Liquid Fire, Coleman fuel, denatured alcohol, glass jars *or* anhydrous ammonia with the intent to manufacture methamphetamine.

The instruction for the August 3, 2001, offense was substantially the same, except that it described the chemicals and equipment found during that search.

The instructions were erroneous in two respects. First, neither included the required culpable mental state of "knowingly." KRS 218A.1432(1); *Beaty v. Commonwealth*, Ky., 125 S.W.3d 196, 204 (2003). The failure to include the *mens*

*rea* element was particularly prejudicial because Appellant's defense was that someone else had "planted" the chemicals and equipment on his property without his knowledge. However, as in *Beaty*, Appellant did not object to the instructions on that basis nor did he include the culpable mental state of "knowingly" in his tendered instructions. Thus, that error is not preserved for appellate review. RCr 9.54(2); *Beaty*, at 204. Second, the instructions, like the instruction in *Varble*, 125 S.W.3d at 255, improperly permitted convictions under KRS 218A.1432(1)(b) if the jury believed that Appellant possessed any, *i.e.*, one or more, of the chemicals or equipment used in the manufacture of methamphetamine with the intent to manufacture methamphetamine. Thus, the instructions would have been erroneous even if the evidence would have supported a conviction under KRS 218A.1432(1)(b). *Varble*, at 255.

As noted in Part I of this opinion, *supra*, although the evidence was sufficient to support convictions of manufacturing methamphetamine under KRS 218A.1432(1)(a), it was insufficient to support convictions under KRS 218A.1432(1)(b). Because the instructions were worded in the alternative, *i.e.*, "he manufactured methamphetamine *or* possessed starting fluid, etc.," (emphasis added), Appellant correctly asserts that the instruction deprived him of his right to a unanimous verdict. *Commonwealth v. Whitmore*, Ky., 92 S.W.3d 76, 81 (2002) ("[A] defendant is denied a unanimous verdict when the jury is presented with alternate theories of guilt in the instructions, and one or more of those theories, but not all, are unsupported by the evidence.") (citing *Burnett v. Commonwealth*, Ky., 31 S.W.3d 878 (2000)). With respect to each charge, the jury simply found Appellant guilty of manufacturing methamphetamine

without identifying the theory under which guilt was found. Thus, Appellant is entitled to a new trial on the charges of manufacturing methamphetamine in violation of KRS 218A.1432(1)(a).

### III. DOUBLE JEOPARDY.

#### A. Instructions.

Appellant first contends that the instructions subjected him to double jeopardy because they allowed the jury to convict him of both possession of anhydrous ammonia in an unapproved container with the intent to manufacture methamphetamine and manufacturing methamphetamine based on the "same conduct," i.e., possessing anhydrous ammonia with the intent to manufacture methamphetamine. This issue is mooted by our conclusion that Appellant could not be convicted of manufacturing methamphetamine premised upon mere possession of anhydrous ammonia. However, we note in passing that the "same conduct" test articulated in Walden v. Commonwealth, Ky., 805 S.W.2d 102, 105–07 (1991), was abandoned in Commonwealth v. Burge, Ky., 947 S.W.2d 805, 809–11 (1996). For a discussion of the double jeopardy ramifications of convicting a defendant of both manufacturing methamphetamine and possession of anhydrous ammonia in an unapproved container with the intent to manufacture methamphetamine, see Kotila, 114 S.W.3d at 239–40.

#### B. Duplication of evidence.

Appellant contends that all of the charges arising from the August 3, 2001, search should be vacated on double jeopardy grounds because the chemicals, equipment, and methamphetamine found during the August 3, 2001, search are the same chemicals, equipment, and methamphetamine found during the July 24, 2001, search, and that the police simply failed to remove those items from his property.

Thus, he claims he has been convicted twice for the same offenses.

During the July 24, 2001, search, the Kentucky State Police officers found:

Two marijuana plants;

Two plastic containers containing "pill dough;"

Jar containing coffee filters and liquid that tested positive for methamphetamine and attached by plastic tubing to a plastic ketchup bottle ("generator") that was smoking when discovered;

Punctured Prestone starting fluid cans;

Denatured alcohol;

Aluminum foil "boat;"

Two funnels;

Mason jar;

Liquid Fire;

Coleman Fuel;

Glass jar containing ether;

Used coffee filters;

Altered propane tank containing anhydrous ammonia;

Bowl of suspected anhydrous ammonia.

According to the search warrant, the Prestone starting fluid cans, aluminum foil "boat," used coffee filters, funnels, and Mason jar were not removed from the property after the search. The propane tank was also not removed, but the police rendered it inoperable by puncturing it with bullet holes.

During the August 3, 2001, search, officers of the Logan County Sheriff's Office found:

Two plastic containers with powder in the bottom that were still smoking and two empty plastic liquid dishwasher bottles that had been fitted with tubing that were still emanating gas;

Salt;

Rubber hose;

Bag of lithium strips;

Punctured Prestone starting fluid cans;

Rolling papers;

Burnt aluminum foil;

Berez torch;

Pipes with burn residue that tested positive for methamphetamine;

Syringes with burn residue that tested positive for methamphetamine;

Glass jar containing anhydrous ammonia;

Glass jar containing liquid that tested positive for methamphetamine;

Altered propane tank punctured by bullet holes.

▮▮▮ Because we have previously determined in Part I of this opinion, *supra,* that the evidence was insufficient to support a conviction of manufacturing methamphetamine under KRS 218A.1432(1)(b) (possession of the chemicals and equipment), and because Appellant was not charged with mere possession of methamphetamine, KRS 218A.1415(1), this issue affects only his convictions of possession of anhydrous ammonia in an unapproved container for the purpose of manufacturing methamphetamine on August 3, 2001, and of use or possession of drug paraphernalia on August 3, 2001. The instruction on possession of anhydrous ammonia on August 3, 2001, permitted a conviction based on possession not only of the anhydrous ammonia found in the glass jar on that date but also on possession of the altered propane tank, despite the fact that the Kentucky State Police had previously disabled the tank for future use by puncturing it with bullet holes, thus precluding a second conviction for possessing anhydrous ammonia in the tank on August 3, 2001. Thus, the conviction of possession of anhydrous ammonia on August 3, 2001, must be reversed for a new trial at which the jury will be instructed that a conviction of unlawfully possessing anhydrous ammonia must be premised upon the anhydrous ammonia found in the glass jar on that date. (The anhydrous ammonia found in the glass jar could not have been the same anhydrous ammonia found in a bowl in the deep freeze during the July 24th search because the officers who found the anhydrous ammonia on July 24th diluted it and poured it out on the ground.)

The statute defining the offense of use or possession of drug paraphernalia provides that "[i]t is unlawful for any person *to use, or to possess with intent to use,* drug paraphernalia for the purpose of . . . manufacturing, . . . ingesting, inhaling . . . a controlled substance in violation of this chapter." KRS 218A.500(2) (emphasis added). Under the "to use" theory, a defendant could be convicted of either presently and unlawfully using the drug paraphernalia or having unlawfully used it in the past. Under the "intent to use" theory, a defendant could be convicted of presently possessing the drug paraphernalia with an intent to unlawfully use it in the future.

The instruction under which the jury convicted Appellant of use or possession of drug paraphernalia on August 3, 2001, was as follows:

You will find the Defendant guilty of possession/use of drug paraphernalia, under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

A. That in this county on or about the 3rd day of August, 2001, the Defendant possessed drug paraphernalia *with the intent to use it* in the furtherance of illegal drug activity or manufacture.

(Emphasis added.)

The jury convicted Appellant of use or possession of drug paraphernalia on July 24, 2001, under an identically worded in-

struction. The trial court did not submit either count of the indictment to the jury under the "to use" theory, effectively granting a directed verdict of acquittal and thereby precluding retrial on that theory. *Kotila,* 114 S.W.3d at 236. "Drug paraphernalia" was defined in a separate instruction that parroted the lengthy definition in KRS 218A.500(1), except that it substituted the word "methamphetamine" for the words "a controlled substance." It is possible, as Appellant asserts, that the liquid that tested positive for methamphetamine on August 3, 2001, was some of the same liquid found in the glass jar that was being "cooked" on July 24, 2001 (the officers who conducted the search on July 24, 2001, did not claim to have confiscated all of that liquid although one would have expected them to have done so). It is also possible, as Appellant asserts, that the punctured Prestone starting fluid cans found by the sheriff's officers on August 3, 2001, were the same cans found by the state police on July 24, 2001, and that the burnt piece of aluminum foil found by the sheriff's officers was the same aluminum foil "boat" with burn marks found by the state police. Otherwise, there does not appear to be any duplication of the items found during the separate searches.

Appellant's double jeopardy claim with respect to the liquid that tested positive for methamphetamine fails because (1) the indictment did not charge Appellant with the offense of possession of methamphetamine, KRS 218A.1415(1), on either occasion; and (2) the product of the manufacturing process, *e.g.,* the methamphetamine that was actually manufactured, is not within the definition of "drug paraphernalia." KRS 218A.500(1). Thus, Appellant could not have been convicted of any crime except manufacturing methamphetamine premised upon his possession of the liquid that tested positive for methamphetamine. And since the trial court did not instruct

the jury on the "to use" theory of KRS 218A.500(2), Appellant could not have been convicted for possessing the empty Prestone starting fluid cans on either occasion. The cans were empty, *i.e.,* did not contain any starting fluid, and thus could not have been possessed with an "intent to use" them to manufacture methamphetamine in the future. However, Appellant may have been twice convicted of possessing the same aluminum foil "boat" with the intent to use it to ingest or inhale methamphetamine.

Although we have never addressed the issue, other jurisdictions have held that uninterrupted possession of the same contraband over a period of time is but one offense constituting a continuing course of conduct, precluding convictions of multiple offenses for possession of the same contraband on different dates. The most oft-cited case on the issue is *United States v. Jones,* 533 F.2d 1387 (6th Cir.1976), in which the defendant was convicted of possession of a firearm by a convicted felon for possessing the same firearm in October 1970, the date he purchased it, in March 1973, when he was stopped for a traffic violation and the officer recorded the fact that he was carrying the weapon, and in December 1973, when officers discovered it while executing a search warrant for suspected bootlegging. *Id.* at 1389–90. Analogizing the facts with those in *Crepps v. Durden,* 98 Eng.Rep. 1283 (K.B.1777) (baker could not be charged with multiple offenses for selling loaves of bread on the Sabbath), and *In re Snow,* 120 U.S. 274, 7 S.Ct. 556, 30 L.Ed. 658 (1887) (practicing Mormon could not be charged with three counts of illegal cohabitation for sharing marital felicity with seven wives over three-year period), the United States Court of Appeals for the Sixth Circuit held in *Jones* that "[p]ossession is a course of conduct, not an act; by prohibiting posses-

sion Congress intended to punish as one offense all of the acts of dominion which demonstrate a continuing possessory interest in a firearm." *Id.*, 533 F.2d at 1391. The Court distinguished *United States v. Hairrell*, 521 F.2d 1264 (6th Cir.1975), where the defendant was charged and acquitted of possessing counterfeit currency, then was properly charged again for possessing the same counterfeit currency after the acquittal because "continued possession after acquittal constituted a new and different offense from that with which he was previously charged." *Hairrell*, 521 F.2d at 1266. *Compare* KRS 505.020(1)(c), *infra.*

In *United States v. Horodner*, 993 F.2d 191 (9th Cir.1993), the Ninth Circuit Court of Appeals interpreted this distinction to mean that an uninterrupted possession would constitute only one offense but that an interrupted possession would permit separate convictions for possession both before and after the interruption. *Id.* at 193. *See also United States v. Rivera*, 77 F.3d 1348, 1351 (11th Cir.1996) ("Where there is no proof that possession of the same weapon is interrupted, the Government may not arbitrarily carve a possession into separate offenses."); *Johnson v. Morgenthau*, 69 N.Y.2d 148, 512 N.Y.S.2d 797, 505 N.E.2d 240, 242–43 (N.Y.1987) (uninterrupted possession of a weapon over a six-day period constituted a continuous offense supporting only one prosecution for criminal possession); *State v. Zele*, 168 Vt. 154, 716 A.2d 833, 837 (Vt.1998) (possession of marijuana occurring on two separate days was a continuing offense); Wayne R. LaFave & Austin V. Scott, Jr., *Substantive Criminal Law* § 3.2(3), at 32 n. 42.1 (Supp.1998) (crime of possession not an act, but a continuing offense, lasting as long as the act of possession does); *compare United States v. Conley*, 291 F.3d 464, 470–71 (7th Cir.2002) (separate convictions of illegal possession of the same firearm on July 7, 1999, and January 27, 2000, upheld where possession was interrupted during a two-month period in which the weapon was in the possession of another person).

KRS 505.020(1)(c) provides:

(1) When a single course of conduct of a defendant may establish the commission of more than one (1) offense, he may be prosecuted for each such offense. He may not, however, be convicted of more than one (1) offense when:

. . .

(c) The offense is designed to prohibit a continuing course of conduct and the defendant's course of conduct was *uninterrupted by legal process*, unless the law expressly provides that specific periods of such conduct constitute separate offenses.

(Emphasis added.)

■■■ Under our statute, the continuing course of conduct can only be carved into separate offenses if it has been interrupted by legal process. "Legal process" would include an arrest warrant, an indictment, or an arraignment. *Morales v. Busbee*, 972 F.Supp. 254, 266 (D.N.J.1997). We conclude that Appellant's arrest for use or possession of drug paraphernalia on July 24, 2001, was a legal process that interrupted his possession of the aluminum foil "boat" so that his subsequent possession of the same paraphernalia (if it was the same) would constitute a separate offense. Thus, if he was twice convicted of possessing the same aluminum foil "boat," those convictions did not constitute double jeopardy.

■■■ Appellant also posits that he was convicted of both possession of drug paraphernalia on August 3, 2001, and manufac-

turing methamphetamine on August 3, 2001, based on his possession of the "smoking" hydrogen chloride "generator." Since those offenses are defined under two separate statutes, this claim must be analyzed under the *Burge/Blockburger* test of whether each statute "requires proof of an additional fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932); *Commonwealth v. Burge*, Ky., 947 S.W.2d 805, 809 (1996). KRS 218A.1432(1)(a) requires that the defendant knowingly and unlawfully manufacture methamphetamine. KRS 218A.500(2) requires that the defendant use or possess with the intent to use drug paraphernalia for the purpose of, *e.g.*, manufacturing methamphetamine. Because the drug paraphernalia instruction only permitted a conviction of that offense under the "intent to use" theory, the jury could not have found guilt of use or possession of drug paraphernalia under a theory that Appellant had already used the "generator" to manufacture methamphetamine. Thus, it must have found that he intended to use it again to manufacture additional methamphetamine in the future. Since one conviction was for the present or past use of the paraphernalia to manufacture methamphetamine and the other for an intent to use the paraphernalia in the future to manufacture additional methamphetamine, each offense required proof of an element that the other did not and no double jeopardy violation occurred.

In conclusion, Appellant's claim of possible multiple convictions for the same offenses requires retrial of the conviction of possessing anhydrous ammonia on August 3, 2001, but does not require retrial of his convictions of use or possession of drug paraphernalia.

## IV. SURPRISE WITNESS.

On July 29, 2001, C.J. Anderson and Johnnie Finn, two of the six persons arrested at Appellant's residence on July 24, 2001, were killed in a single-car accident while operating a vehicle owned by Appellant. During their investigation of this accident, two Kentucky State Police officers interviewed Anderson's girlfriend, Christina Hester. On July 31, 2001, Hester gave the police a written statement to the effect that a friend had told her that Appellant had threatened to kill everyone who had been at his residence on July 24th and that he had "done something" to his vehicle before loaning it to Anderson and Finn. Appellant was never charged with causing the deaths of Anderson and Finn. However, Hester's statement also contained information that she and Anderson had spent the weekend of July 20–22, 2001, at Appellant's residence and that "during the weekend, Ricky and his friends were smoking and making meth (crank)."

Although Hester's statement was filed in the district court record of the charges stemming from the August 3, 2001, search and is found at pages 7–10 of the transcript of record of Indictment No. 01–CR–179, it was not discovered by the Commonwealth's attorney until the second day of trial. Thus, a copy of the statement was not furnished to Appellant's counsel forty-eight hours prior to trial as required by RCr 7.26(1). And since the statement contained evidence of prior misconduct, the Commonwealth also failed to comply with the notice requirement of KRE 404(c). Both rules allow admission of the evidence despite noncompliance "for good cause shown." The trial court concluded that the Commonwealth's failure to discover the statement was "good cause shown" and permitted Hester to testify. The statement was part of the public record of this case; thus, defense counsel, as well as the prosecutor, could be charged with constructive knowledge of its existence.

 Appellant moved to exclude any evidence of his having ingested or manufactured methamphetamine on another occasion, citing KRE 404(b). That rule proscribes admission of other crimes, wrongs or acts to prove the character of a person in order to show action in conformity therewith. However, such evidence is admissible if relevant for a purpose other than to prove character, *e.g.*, to prove motive, opportunity, intent, etc. KRE 404(b)(1); *Tamme v. Commonwealth*, Ky., 973 S.W.2d 13, 29 (1998). Evidence that Appellant had participated in the manufacture of methamphetamine on his property only two days before the July 24th search was relevant to disprove his defense that he was "framed," *i.e.*, someone else had "planted" the chemicals and equipment on his property without his knowledge. *Cf. Young v. Commonwealth*, Ky., 25 S.W.3d 66, 71 (2000) (evidence that defendant had previously manufactured methamphetamine admissible to disprove his claim that he did not know how to manufacture methamphetamine). Evidence that Appellant had ingested methamphetamine was relevant to prove a motive to manufacture it. *United States v. Cunningham*, 103 F.3d 553, 557 (7th Cir.1996) (evidence of nurse's Demerol addiction admissible to show motive to tamper with Demerol-filled syringes); *State v. Kealoha*, 95 Hawai'i 365, 22 P.3d 1012, 1027 (App.2000) ("Evidence that Defendant sold methamphetamine to finance her cocaine use is probative of whether Defendant had a motive to manufacture methamphetamine and her intent to do so."); *cf. Adkins v. Commonwealth*, Ky., 96 S.W.3d 779, 793 (2003) (evidence of drug habit, along with evidence of insufficient funds to support habit, relevant to show motive to commit robbery in order to obtain money to buy drugs). The trial judge did not abuse his discretion in determining that the prejudicial effect of this evidence did not substantially outweigh its probative value. KRE 403; *Commonwealth v. English*, Ky., 993 S.W.2d 941, 945 (1999).

 Hester was not permitted to testify with respect to Appellant's terroristic threats or the deaths of Anderson and Finn. Nor was she permitted to repeat the assertion made in her written statement that Appellant made sexual advances toward her both before and after Anderson's death. However, she did testify that Appellant not only manufactured and used methamphetamine during the weekend of July 20–22, 2001, but that he also directed others, including Anderson and Cherry, to sell methamphetamine and return the money to him. She claimed to have seen Appellant place money from those sales into his wallet. The trial court ultimately decided that this evidence should not have been admitted because Appellant was not charged with trafficking in methamphetamine, and admonished the jury to disregard it.[2]

 There is a presumption that an admonition "can cure a defect in testimony." *Alexander v. Commonwealth*, Ky., 862 S.W.2d 856, 859 (1993), *overruled in part on other grounds by Stringer v. Commonwealth*, Ky., 956 S.W.2d 883, 891 (1997). *See also Price v. Commonwealth*, Ky., 59 S.W.3d 878, 881 (2001). The presumption is overcome only (1) when an overwhelming probability exists that the jury is incapable of following the admonition *and* a strong likelihood exists that "the inadmissible evidence would be devastating to the defendant; and (2) when the question was asked without a factual basis

---

**2.** Since evidence of sales of methamphetamine would tend to prove a motive to manufacture it, we assume the trial judge concluded that its probative value in that regard was substantially outweighed by its prejudicial effect.

*and* was 'inflammatory' or 'highly prejudicial." ' *Johnson v. Commonwealth,* Ky., 105 S.W.3d 430, 441 (2003) (citations omitted). The second situation has no application here. As for the first, we are unable to conclude that a jury would be incapable of following the admonition. *See, e.g., Kinser v. Commonwealth,* Ky., 741 S.W.2d 648, 653 (1987) (admonition sufficient to cure police testimony that he "knew enough about the case to think that [the defendants] had possibly committed this murder"). Further, since the jury had already heard that Appellant had both manufactured and ingested methamphetamine, it seems hardly "devastating" that the jury also heard that he sold some of it.

## V. SUBSEQUENT OFFENSE ENHANCEMENT.

■ The penalty phase instructions described each August 3, 2001, offense as a "second offense" and instructed the jury on subsequent offense penalty ranges for each offense. Thus, instead of imposing Class B felony penalties for manufacturing methamphetamine and possessing anhydrous ammonia in an unapproved container with the intent to manufacture methamphetamine, the jury imposed Class A felony penalties for those offenses; and instead of imposing a Class A misdemeanor penalty for possession of drug paraphernalia, the jury imposed a Class D felony penalty. KRS 218A.010(25) provides:

> [F]or purposes of this chapter an offense is considered as a second or subsequent offense, if, *prior to his conviction* of the offense, *the offender has at any time been convicted* under this chapter, or under any statute of the United States, or of any state relating to substances classified as controlled substances or counterfeit substances ....

(Emphasis added.) Thus, enhancement is not premised upon an offense-to-offense sequence but upon a conviction-to-conviction sequence. "The chapter on controlled substances specifically defines a subsequent offense as a conviction occurring after a prior conviction, thus codifying the *Ball/Royalty[Commonwealth v. Ball,* Ky., 691 S.W.2d 207, 210 (1985); *Royalty v. Commonwealth,* Ky.App., 749 S.W.2d 700 (1988) ] interpretation for purposes of those statutes." 1 Cooper, *Kentucky Instructions to Juries (Criminal)* § 12.25, cmt., at 757 (4th ed. rev.1999). *Compare* KRS 500.080(11) which provides that, for purposes of the Kentucky Penal Code, " '[o]ffense' means *conduct* for which a sentence to a term of imprisonment or to a fine is provided by law ...." (Emphasis added.)

■ The offense of possession of anhydrous ammonia in an unapproved container with the intent to manufacture methamphetamine is defined in neither the Controlled Substances Act nor the Kentucky Penal Code. KRS 250.991(2) refers to an enhanced penalty for a "subsequent offense" without defining it. In that circumstance, we have always interpreted such language to require a conviction-to-offense sequence, *i.e.,* the second offense must occur after conviction of the first offense. *See e.g., Denham v. Commonwealth,* 311 Ky. 320, 224 S.W.2d 180, 182 (1949) (interpreting KRS 242.990(1), local option law); *Coleman v. Commonwealth,* 276 Ky. 802, 125 S.W.2d 728, 729 (1939) (interpreting former KRS 431.190, Habitual Offender Act, repealed 1974 Ky. Acts, ch. 406, § 336, eff. Jan. 1, 1975).[3] The

---

**3.** We have also construed KRS 532.080(2) and (3) (persistent felony offender) as requiring a conviction-to-offense sequence even though the language of those provisions would seem to mandate a conviction-to-conviction sequence. *Bray v. Commonwealth,* Ky., 703 S.W.2d 478, 479–80 (1985); *see also Dillingham v. Commonwealth,* Ky.App.,

rationale behind this interpretation is that "[a]fter punishment is imposed for the commission of a crime, the double penalty is held in terrorem over the criminal, for the purpose of effecting his reformation, and preventing further and subsequent offenses by him." *Brown v. Commonwealth*, 100 Ky. 127, 37 S.W. 496, 496 (1896). We adopt this interpretation for subsequent offenses prosecuted under KRS 250.991(2).

Since Indictments No. 01–CR–157 and 01–CR–179 were tried jointly, Appellant could not have been previously convicted of the July 24, 2001, Controlled Substances Act offenses at the time he was convicted of the August 3, 2001, Controlled Substances Act offenses. Nor was he convicted of the July 24, 2001, anhydrous ammonia offense before he committed the August 3, 2001, anhydrous ammonia offense. Thus, he is entitled to new penalty phase trials with respect to his convictions of possession of anhydrous ammonia in an unapproved container with intent to manufacture methamphetamine and possession of drug paraphernalia at which there shall be no subsequent offense penalty enhancement. If, upon retrial, Appellant is again convicted of two counts of manufacturing methamphetamine, the conviction under Indictment No. 01–CR–179 shall not be subject to enhancement as a second or subsequent offense.

Accordingly, Appellant's convictions of manufacturing methamphetamine are reversed and remanded for a new trial; his conviction of possession on July 24, 2001, of anhydrous ammonia in an unapproved container with intent to manufacture methamphetamine and the sentence imposed therefor are affirmed, but his conviction of possession on August 3, 2001, of anhydrous ammonia in an unapproved container with the intent to manufacture methamphetamine and the sentence imposed therefor are reversed and remanded for a new trial; his convictions of possession of marijuana and possession of drug paraphernalia on July 24, 2001, and the sentences imposed for those offenses are affirmed; and his conviction of possession of drug paraphernalia on August 3, 2001, is affirmed but the sentence imposed therefor is vacated and remanded for a new sentencing phase. Any convictions obtained under Indictment No. 01–CR–179 shall not be subject to subsequent offense enhancement.

LAMBERT, C.J.; JOHNSTONE, KELLER, and STUMBO, JJ., concur.

GRAVES, J., dissents by separate opinion, with WINTERSHEIMER, J., joining that dissenting opinion.

Dissenting opinion by Justice GRAVES.

Respectfully, I must dissent because of the unsoundness of the majority's interpretation and application of KRS 218A. 1432. Such a narrow and unreasonable interpretation of a chemical concept has a destructive effect on the enforcement of drug laws. The majority is reversing the conviction of an individual caught red-handed in the process of manufacturing methamphetamine. In *Kotila v. Commonwealth*, Ky., 114 S.W.3d 226, 237 (2003), I was part of the majority that was seduced by a metaphysical infatuation which led to an absurdity. Our opinion in *Kotila* does violence to the concept of common sense.

Methamphetamine can be produced under several methods. Chemically speaking, the essential, indispensable,

---

684 S.W.2d 307, 309 (1984). The General Assembly also appears to have adopted the conviction-to-offense sequence for subsequent offense enhancement of operating a motor vehicle while impaired. KRS 189A.010(5)(e) (defining prior offenses as "all convictions" obtained prior to the subsequent offense).

and necessary chemicals are ephedrine (or psuedoephedrine) and a reducing agent to remove an oxygen atom.

There are several other pathways for the reaction to occur, using other precursors for reduction, and most certainly there are a variety of solvents that could be effectively used. This is a simple oxidation reduction reaction which is taught in elementary chemistry. There are multiple chemicals that can serve as reducing agents. Thus, to say that all the necessary catalysts, reducing agents, and solvents must be present has opened up a real can of worms.

There are multiple chemicals including water and alcohol that are merely used as solvents for an extraction process. To list all of them would make the statute unwieldy.

I think a more reasonable common sense application of the statute is that the statute is satisfied if the defendant is apprehended with ephedrine and a reducing agent.

Wintersheimer, J., joins this dissenting opinion.