**Johnathan PARKS, Appellant**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2003–SC–0305–MR.

Supreme Court of Kentucky.

May 18, 2006.

John T. McCall, Christopher F. Polk, Louisville, Counsel for Appellant.

Gregory D. Stumbo, Attorney General, State Capitol, Dennis W. Shepherd, Office of Attorney General, Frankfort, Counsel for Appellee.

Opinion of the Court by Justice COOPER.

At 8:00 p.m. on February 26, 2002, Appellant, Johnathan Parks, while operating a vehicle owned by his wife, was stopped and arrested at the intersection of Highways 88 and 226 in the town of Peonia, Grayson County, Kentucky. Also arrested were his two passengers, Matthew Morris, who was seated in the right front passenger seat, and Douglas Blakeman, who was seated in the right rear passenger seat. A search of the vehicle conducted after the arrests revealed, *inter alia*, (1) a black plastic trash bag on the floorboard behind the driver's seat that contained a modified propane gas tank filled with anhydrous ammonia; (2) another plastic bag on the back seat that contained a flashlight

equipped with two lithium batteries and an opened package containing two identical lithium batteries; and (3) two unopened cans of starting fluid in the glove compartment.

Prior to trial, Blakeman and Morris pled guilty to reduced charges of criminal facilitation to manufacturing methamphetamine for which each was sentenced to three years in prison (plus an additional one year each for having escaped from custody after being transported to Blakeman's residence for the purpose of executing a search warrant for the premises). Both testified as witnesses for the Commonwealth. Morris testified that Blakeman had placed the black plastic bag containing the tank filled with anhydrous ammonia inside the vehicle and that the flashlight and batteries belonged to Blakeman. Appellant admitted that he owned the starting fluid but claimed he kept it in the vehicle in case the car failed to start because of cold weather. The Commonwealth's expert, Detective Billy Edwards, testified that anhydrous ammonia, lithium, and ether (contained in starting fluid) are chemicals used in the manufacture of methamphetamine, but that methamphetamine cannot be manufactured by use of those chemicals alone. On the night of the arrest, Detective Edwards was called to the scene and destroyed the anhydrous ammonia by shooting a shotgun shell into the propane tank, thereby causing the anhydrous ammonia to escape and disperse.[1] The starting fluid, the flashlight, and the two additional batteries were retained as evidence and introduced at trial.

Appellant was convicted of one count of manufacturing methamphetamine, KRS 218A.1432(1)(b), and one count of possession of anhydrous ammonia in an unapproved container with intent to manufacture methamphetamine, KRS 250.489(1); KRS 250.991(2), both Class B felonies. Though the jury instructions permitted his convictions as either principal or accomplice, the verdict forms returned by the jury did not specify under which theory guilt was found. The jury also found Appellant to be a persistent felony offender in the second degree, KRS 532.080(2), and fixed his enhanced sentences at twenty years in prison for each offense to be served consecutively for a total of forty years. The trial court entered judgment and sentenced Appellant in accordance with the verdicts of the jury. He appeals to this Court as a matter of right. Ky. Const. § 110(2)(b).

We now vacate both of Appellant's convictions and his sentences because (1) the Commonwealth's own evidence specifically disproved the essential element that Appellant possessed the anhydrous ammonia with the intent to manufacture methamphetamine—either as principal or accomplice; and (2) even if possession of the starting fluid and flashlight batteries would suffice to convict of manufacturing methamphetamine under KRS 218A.1432(1)(b), that evidence should have been suppressed because it was obtained as a result of an unlawful detention.

## FACTS.

Appellant resided with his wife and three-year-old daughter in an apartment in Leitchfield, the county seat of Grayson County. Morris and Blakeman resided in separate residences in Clarkson, approximately five miles east of Leitchfield via U.S. Highway 62, and approximately five miles north of Peonia via Kentucky High-

---

**1.** This is a common law enforcement precaution against the dangers of transporting anhydrous ammonia in a modified propane tank.

way 88. Blakeman lived in a mobile home located directly behind his father's residence at 408 Peonia Road (Highway 88). At 3:00 p.m. on February 26, 2002, Detective Tony Willen of the Grayson County Sheriff's Department received a tip from a confidential informant that Blakeman and Morris had manufactured some methamphetamine and would be selling it at 408 Peonia Road. Willen prepared an affidavit for a search warrant that provided, *inter alia:*

> On this date the affiant received information from a confidential informant that Doug Blakeman and Matt Morris would be *at 408 Peonia Rd.* selling the methamphetamine that the two manufactured earlier this date. The confidential informant has provided information in the past, on at least three separate occasions and this information was reliable and accurate each time. Previous information has resulted in convictions. Acting on the information received, the affiant conducted the following independent investigation:
>
> The affiant has received information in the past from the public and from other police agencies that Mr. Blakeman and Matt Morris were involved in the manufacturing of controlled substances. Criminal records show that *Doug Blakeman lives at 408 Peonia Rd. Detective Willen also has personal knowledge as to the location of the residence of Mr. Blakeman.*

(Emphasis added.)

Based on this affidavit, a Grayson District Court Judge issued a search warrant that provided, *inter alia:*

> [Y]ou are commanded to make immediate search of the premises *known and numbered as the Doug Blakeman residence*, at:
>
> *408 Peonia Rd.*
> *Clarkson, Ky. 42726*

And more particularly described as follows:

> ... The residence is *a Trailer located on the east side of Peonia Rd.* and the front of the residence faces west. The property has several outbuildings located on the property and also several vehicles. The numbers 408 are located on the mailbox that is directly in front of the house and is clearly visible from the roadway. *The Trailer* sets [sic] behind a white house owned by Blakeman's father.

And/or in a vehicle or vehicles described as:

> Any vehicle registered to Doug Blakeman, Matt Morris *or any vehicle on the property at the time this search warrant is executed.*

And/or the person or persons of:

> Doug Blakeman, Matt Morris or any person present at the time this search warrant is executed.

And the following described personal property: to search for *evidence related to the offenses of manufacturing, trafficking and possession of Controlled Substances, To Wit: Methamphetamine. To search for the items used to manufacture methamphetamine* to include but not limited to Lithium batteries, table salt, Anhydrous Ammonia, Ether, Ephedrine or Pseudoephedrine tablets, liquid fire, coffee filters, rubber gloves, gas masks and glassware. To search for items or material that is frequently used to package controlled substances to include but not limited to plastic sandwich bags, zip lock bags, small plastic envelopes and twist ties. To search for devices used to weigh controlled substances, either manual or electronic.

To search for records, written or electronic to include pagers, cellular phones, call identification devices, computers and

disk/tapes for computers that shows [sic] the identity of those persons involved in the cultivation/distribution and purchasing of controlled substances. To search for moneys obtained from the sale of controlled substances, records written and electronic that shows [sic] where moneys are obtained and how moneys are expended and secreted. To search for items or devices used to introduce controlled substances into the human body to include but not limited to pipes, rolling papers, bongs and stems.

(Emphasis added.)

Appellant testified that when he arrived home from work on February 26, 2002, there was a note on his door to contact Morris. According to Appellant, he proceeded with his wife and child to Morris's residence in Clarkson, arriving at approximately 7:30 p.m. Both Morris and Blakeman were present. Blakeman did not own a motor vehicle and Morris's vehicle was temporarily disabled. Blakeman told Appellant that he had "fallen out" with his father and asked if Appellant would help him move some clothing and personal belongings from his mobile home in Peonia to a residence in Annetta, another small community in Grayson County. The most direct route from Clarkson to Annetta is through Peonia. Appellant, Blakeman, and Morris proceeded to 408 Peonia Road, leaving Appellant's wife and child at Morris's residence. After arriving at Blakeman's residence, Appellant engaged in a conversation with Blakeman's brother while Blakeman and Morris loaded various plastic bags and a black shoulder satchel into the vehicle.

Appellant admitted that he saw Blakeman load the black plastic bag subsequently found to contain the propane tank filled with anhydrous ammonia into the back seat, but claimed he believed it contained only Blakeman's clothing or other personal belongings. Detective Willen admitted at trial that the plastic bag was large enough to completely enclose the propane tank, but stated that the top of the tank was sticking out of the bag at the time he found it on the floorboard behind the driver's seat of the vehicle. Both Morris and Blakeman testified as witnesses for the Commonwealth, without objection, that "everyone in the vehicle knew" that the black plastic bag contained a propane tank filled with anhydrous ammonia. Morris further testified for the Commonwealth that he had made arrangements to "trade" the anhydrous ammonia to Joey Barnes for an unspecified amount of methamphetamine and that the transaction would occur in Leitchfield. Blakeman testified for the Commonwealth that he did not know how much methamphetamine they would receive in exchange for the tank of anhydrous ammonia. The most direct route from Clarkson to Leitchfield is via U.S. 62, not via Kentucky 88 through Peonia.[2]

## I. SUFFICIENCY OF THE EVIDENCE.

At the time these offenses were committed, KRS 218A.1432(1)(b) provided:

(1) A person is guilty of manufacturing methamphetamine when he knowingly and unlawfully:

. . . .

(b) Possesses the chemicals or equipment for the manufacture of methamphetamine *with the intent to manufacture methamphetamine.*

(Emphasis added.)

At the time these offenses were committed, KRS 250.489 and KRS 250.991 provided in pertinent part:

---

**2.** The jury, of course, was entitled to believe either that Appellant's intent was to go first to Annetta, then to Leitchfield, or that his intent was to take the more circuitous route through Peonia to avoid detection.

KRS 250.489. Possession of anhydrous ammonia in unapproved container prohibited—Exceptions—Affirmative defense.

(1) It shall be unlawful for any person to knowingly possess anhydrous ammonia in any container other than an approved container.

KRS 250.991. Penalties for violation of anhydrous ammonia provisions.

. . . .

(2) Any person who knowingly possesses anhydrous ammonia in a container other than an approved container in violation of KRS 250.489 is guilty of a Class D felony *unless* it is proven that the person violated KRS 250.489 *with the intent to manufacture methamphetamine* in violation of KRS 218A.1432, in which case it is a Class B felony for the first offense and a Class A felony for each subsequent offense.

(Emphasis added.)

■ At the time these offenses were committed, KRS 218A did not contain a definition of "intent to manufacture." However, the General Assembly subsequently enacted KRS 218A.010(14), which defines the phrase, *inter alia,* as "any evidence which demonstrates a person's conscious objective *to manufacture* a controlled substance or methamphetamine." 2005 Ky. Acts, ch. 150, § 7. Where an ambiguous statutory meaning is clarified by subsequent legislation, that subsequent legislation is strong evidence of the legislative intent of the first statute. *Kotila v. Commonwealth,* 114 S.W.3d 226, 238 (Ky. 2003), *overruled on other grounds by Matheney v. Commonwealth,* 191 S.W.3d 599 (Ky., 2006). The phrase "to manufacture" in KRS 218A.010(14) clearly requires that Appellant's intent in possessing the anhydrous ammonia, the starting fluid, and the lithium batteries must have been that

he, himself, either as principal or accomplice, would use those items to manufacture methamphetamine. The definition does not say, *e.g.,* "with the intent that methamphetamine will be manufactured."

■ No doubt, there are cases in which a jury could reasonably infer an intent to manufacture methamphetamine from evidence that the defendant was in possession of anhydrous ammonia in an unapproved container and other surrounding circumstances. *See Fulcher v. Commonwealth,* 149 S.W.3d 363, 370 (Ky.2004) (evidence of ongoing methamphetamine manufacturing process and presence of other chemicals necessary to manufacture methamphetamine permitted inference by jury that defendant possessed anhydrous ammonia with intent to manufacture methamphetamine). However, when, as here, the Commonwealth's own evidence disproved that Appellant possessed the anhydrous ammonia "with the intent to manufacture methamphetamine," but proved instead that he possessed it with the intent to *trade it to another person in exchange for* some already-manufactured methamphetamine, and there is not a scintilla of evidence to the contrary, it was clearly unreasonable for the jury to find Appellant guilty as a principal. *Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky.1991).

■ The jury may have found otherwise because the instructions on both offenses omitted the required element that the possession of the chemicals or equipment and of the anhydrous ammonia be "with the intent to manufacture methamphetamine." Instead, the instructions permitted a finding of guilt if Appellant possessed "equipment and/or raw material for manufacturing methamphetamine ... *for the purpose of* manufacturing methamphetamine," and possessed anhydrous ammonia "*for the purpose of* manufacturing methamphet-

amine." (Emphasis added.) Obviously, possession "for the purpose of" manufacturing methamphetamine does not require the same personalized intent as does possession "with the intent to" manufacture methamphetamine. And, obviously, "raw materials" is a broader concept than "chemicals." The trial court may have altered the statutory language out of concern that the jury might not realize that lithium, a metallic element, is a chemical when used to manufacture methamphetamine (since such was not specifically proven at trial). However, instructions in criminal cases should conform to the language of the statute. *McGuire v. Commonwealth,* 885 S.W.2d 931, 936 (Ky.1994). It is left to the lawyers to "flesh out" the "bare bones" in closing argument. *Id.* Otherwise, as here, the jury might convict a defendant for conduct not specifically proscribed by the statute. However, if an instruction conference was held in this case, it was not recorded; thus, we have no way of knowing if Appellant preserved these additional errors by timely objection.

Nevertheless, the record clearly reflects that defense counsel moved for a directed verdict of acquittal on both counts of the indictment at the close of the Commonwealth's case and again at the close of all the evidence, specifying as grounds the failure to prove the intent element of both offenses. Based on the Commonwealth's own proof, that motion should have been granted. *Turner v. Commonwealth,* 153 S.W.3d 823, 828–29 (Ky.2005) (conviction of wanton murder reversed where Commonwealth's evidence insufficiently proved *mens rea* element necessary to convict of wanton murder). Instead, the jury was permitted to convict Appellant of two offenses, both premised upon the possession of anhydrous ammonia in an unapproved container in direct contradiction of uncontroverted evidence that his possession of the anhydrous ammonia was not with the intent to manufacture methamphetamine.

The Commonwealth's complicity theory is that Appellant intended to deliver the anhydrous ammonia, starting fluid, and lithium batteries to Barnes, who would then possess them with the intent to manufacture methamphetamine.

> Two co-defendants, both of whom had entered guilty pleas to complicity to manufacture methamphetamine [3] testified against the appellant that the appellant was driving them and these ingredients to a person who would take the ingredients to use in the manufacture of methamphetamine, and give the three suppliers with [sic] processed methamphetamine.

Brief for Commonwealth, at 32. (Of course, anhydrous ammonia, ether, and lithium are not "ingredients" of methamphetamine but only chemicals used in the manufacture of methamphetamine.)

The Commonwealth posits in its brief that "this case is a complicity liability case, which, by definition, does not require the proof of each element of the underlying offense." *Id.* at 31. That, of course, is simply not so. Complicity liability under KRS 502.020 is not an inchoate offense, such as the offenses described in KRS Chapter 506, *e.g.,* criminal facilitation, KRS 506.080, the offense to which Blakeman and Morris pled guilty. Inchoate offenses carry reduced penalties because the underlying offense was never actually committed. However, unlike an inchoate offense, "KRS 502.020 does not create a new offense known as complicity." *Commonwealth v. Caswell,* 614 S.W.2d 253, 254

---

**3.** As noted earlier, Blakeman and Morris actually pled guilty to criminal facilitation to manufacture methamphetamine, a Class D felony, KRS 506.080(2), not complicity to manufacture methamphetamine, a Class B felony.

(Ky.App.1981). "[O]ne who is found guilty of complicity to a crime occupies the same status as one being guilty of the principal offense." *Wilson v. Commonwealth,* 601 S.W.2d 280, 286 (Ky.1980).

 Thus, to convict a defendant of guilt by complicity, the jury must find beyond a reasonable doubt that the offense was, in fact, committed by the person being aided or abetted by the defendant. KRS 502.020(1); *Harper v. Commonwealth,* 43 S.W.3d 261, 265 (Ky.2001) ("In a prosecution pursuant to KRS 502.020(1), in addition to having to prove that it was the defendant's intention to promote or facilitate the charged offense, the Commonwealth has the burden of proving the commission of the charged offense by another person and of proving that the defendant participated in that offense."); Robert G. Lawson & William H. Fortune, *Kentucky Criminal Law* § 3–3(d)(2), at 117 (1998) ("Complicity liability requires (1) proof of commission of an offense by another person and (2) proof of the defendant's participation in commission of that offense." (Footnote omitted.)). Therefore, guilt in this case could not be premised upon a complicity theory that Appellant aided and abetted Joey Barnes's possession of the anhydrous ammonia, starting fluid, and/or lithium batteries with the intent to manufacture methamphetamine. Detective Edwards destroyed the anhydrous ammonia at the scene of the arrest, and the starting fluid and batteries were confiscated by the arresting officers. Joey Barnes never possessed any of those items, regardless of his intent; thus, Appellant could not have been complicit in such possession.[4]

 On the basis of the evidence presented in this case, a jury could have found Appellant guilty of the Class D felony of possession of anhydrous ammonia in an unapproved container. *Dixon v. Commonwealth,* 149 S.W.3d 426, 429 (Ky.2004) (contents of automobile are presumed to belong to its operator). However, the trial court did not instruct the jury on that offense as a lesser included offense. Appellant would have been entitled to such an instruction if he had requested it. *Slaven v. Commonwealth,* 962 S.W.2d 845, 856 (Ky.1997) (lesser included offense is, in fact and principle, a defense against the higher charge, and the defendant is entitled to an instruction on that offense if supported by the evidence). Likewise, the Commonwealth would have been entitled to such an instruction, if requested, even over Appellant's objection. *Commonwealth v. Elmore,* 831 S.W.2d 183, 184 (Ky.1992). However, the mere fact that the jury could have been instructed on and could have convicted Appellant of a lesser included offense does not require remand for a new trial on that offense. *The only offenses of which Appellant's jury was entitled to convict him were the offenses described in the instructions*—being a principal or accomplice to manufacturing methamphetamine and possession of anhydrous ammonia in an unapproved container with the intent to manufacture methamphetamine. The evidence presented by the Commonwealth proved that he did not

---

4. Because it was impossible to convict Appellant as an accomplice, he would be entitled to a new trial even if the jury could have reasonably disregarded the Commonwealth's evidence and found him guilty as a principal on the basis of an inference arising from his mere possession of the anhydrous ammonia, starting fluid, and flashlight batteries. By instructing the jury on an alternative theory unsupported by any evidence, the trial court denied Appellant his right to a unanimous verdict. *Commonwealth v. Whitmore,* 92 S.W.3d 76, 81 (Ky.2002); *Burnett v. Commonwealth,* 31 S.W.3d 878, 881–83 (Ky.2000). Again, however, because the instruction conference was not recorded, it is unknown whether defense counsel made a timely objection to this improper instruction.

possess anhydrous ammonia in an unapproved container with the intent to manufacture methamphetamine. The Commonwealth cannot choose to try a defendant solely on the indicted offense and then, after an acquittal, retry the defendant on a lesser included offense arising out of the same or less facts. KRS 505.040(1)(a), *viz:*

> Although a prosecution is for a violation of a different statutory provision from a former prosecution ..., it is barred by the former prosecution under the following circumstances:
>
> (1) The former prosecution resulted in an acquittal, a conviction which has not subsequently been set aside, or *a determination that there was insufficient evidence to warrant a conviction,* and the subsequent prosecution is for:
>
> (a) An offense of which the defendant could have been convicted at the first prosecution; ....

(Emphasis added.) Specifically:

> KRS 505.040(1)(a) prohibits reprosecution for "lesser included offenses." For example, a defendant acquitted of murder may not be reprosecuted for assault if the latter charge involves the same conduct that was involved in the murder prosecution; similarly, one who is convicted of robbery may not be reprosecuted for theft for a taking of the same property; and, after a directed verdict of acquittal upon a burglary charge, a defendant could not be reprosecuted for criminal trespass for the entry that was involved in the initial prosecution.

Lawson & Fortune, *supra*, § 6–3(e)(3), at 249 (footnotes omitted). Thus, KRS 505.040(1)(a) precludes reprosecution of Appellant for the Class D version of possession of anhydrous ammonia in an unapproved container based on the same facts that led to his conviction of the Class B version of the same offense. In sum, Appellant is entitled to have his conviction of possession of anhydrous ammonia in an unapproved container with the intent to manufacture methamphetamine and the sentence imposed therefor vacated.

■■■ Since the jury was permitted to consider Appellant's possession of the anhydrous ammonia in determining his guilt of manufacturing methamphetamine,[5] Appellant would be entitled at worst to a new trial on that charge premised solely upon his possession of the starting fluid and lithium batteries. *See Matheney*, 191 S.W.3d at 604 ("We construe the language of KRS 218A.1432(1)(b) that states 'the chemicals or equipment for the manufacture of methamphetamine' to mean that one must possess two or more chemicals or items of equipment with the intent to manufacture methamphetamine to fall within the statute."); *Stopher v. Commonwealth*, 57 S.W.3d 787, 802 (Ky.2001) ("[I]ntent may be inferred from actions because a person is presumed to intend the logical and probable consequences of his conduct, and a person's state of mind may be inferred from actions preceding and following the charged offense."); *Hudson v. Commonwealth*, 979 S.W.2d 106, 110 (Ky. 1998) (an inquiry into intent is "a subjective matter"); *Whisman v. Commonwealth*, 667 S.W.2d 394, 398 (Ky.App.1984) (intent to traffic in drugs can be inferred from possession of a quantity of drugs inconsistent with defendant's personal needs accompanied by suspicious conduct when stopped). Presumably, it would be for the jury to decide whether possession

---

5. In closing argument, the prosecutor argued that possession of the starting fluid and flashlight batteries could be perfectly innocent, but not when considered in conjunction with possession of anhydrous ammonia.

of two cans of starting fluid and four lithium batteries was inconsistent with Appellant's personal needs so as to warrant an inference that he possessed them with the intent to manufacture methamphetamine. However, because the starting fluid and batteries were the fruits of an unlawful search, evidence of their possession by Appellant should have been suppressed, leaving no evidence to support a conviction of manufacturing methamphetamine under KRS 218A.1432(1)(b).

## II. UNLAWFUL SEARCH.

A hearing on Appellant's motion to suppress the evidence seized from his wife's automobile was held five months prior to trial. The only witness who testified at the suppression hearing was Officer Shawn Lee of the Clarkson Police Department. Lee testified that Detective Willen called him [6] from Leitchfield and advised that he was in the process of obtaining a search warrant for 408 Peonia Road, and asked Lee to drive to that location and determine if either Blakeman or Morris was present at that address. Lee drove to Blakeman's residence and observed both Blakeman and Morris on the premises. When Lee called Willen to advise him of that fact, Willen asked him to "watch the residence." Lee then observed Blakeman and Morris enter an unidentified vehicle [7] and proceed south on Highway 88 toward Peonia. When Lee advised Willen of that fact, Willen asked him to follow the vehicle. Lee updated Willen twice on the progress of the vehicle. Finally, Willen called Lee

and advised him that he had obtained a search warrant for Blakeman's residence and for Blakeman and Morris, and asked Lee to stop the vehicle. Lee then activated his emergency lights and stopped the vehicle. Lee approached the vehicle and asked Appellant to produce his driver's license. Willen arrived shortly thereafter and assumed control of the scene. Lee did not testify to any events that occurred after Willen's arrival.[8]

Lee admitted that Appellant was operating the vehicle in a proper manner prior to the stop and that his only reason for making the stop was Willen's request that he do so because he had obtained the search warrant. Lee did not testify that he believed the vehicle being operated by Appellant was registered to Blakeman or Morris;[9] and, obviously, the vehicle was not "any vehicle on the property at the time this search warrant is executed," because it had departed 408 Peonia Road before the warrant was even obtained. Thus, the vehicle, itself, was not subject to search under the warrant. Furthermore, Lee did not testify that he had any grounds to arrest any of the occupants or that any of the chemicals subsequently discovered during the search of the vehicle were in plain view.

Willen did not testify at the suppression hearing, and no other evidence was offered at that hearing to explain why Willen asked Lee to stop the vehicle other than Lee's testimony that Willen asked him to stop the vehicle because he (Willen) had obtained the search warrant. (However,

---

6. Lee did not state whether the communication was by telephone, by police radio, or by some other medium.

7. Although this vehicle was discovered to belong to Appellant's wife, Appellant's identity was unknown to Willen and Lee at this point in time.

8. Willen testified at trial that upon his arrival, he placed all three occupants of the vehicle under arrest, then searched the vehicle.

9. Willen testified at trial that he knew the vehicle belonged "either to [Appellant] or his girlfriend," though he did not say whether he ascertained that fact before or after the vehicle was stopped.

Willen testified by avowal at trial that he asked Lee to stop the vehicle because "it was leaving a residence that I was on route to serve a search warrant on.") Since Willen did not testify at the suppression hearing, there was also no evidence to prove why Willen placed the three occupants of the vehicle under arrest (and no claim that the search of the vehicle was incident to a lawful arrest).

▮▮▮▮ The trial court upheld the search of the vehicle on grounds that Appellant was on probation and, as a condition of probation, had signed an agreement permitting "any properly identified law enforcement officer to conduct a complete search of me, my residence and my premises including vehicles, building, and containers, under my care custody and control." Such prior consent will support a warrantless search if the officer has a "reasonable suspicion" that the person who gave the consent is presently engaged in criminal activity. *United States v. Knights*, 534 U.S. 112, 121–22, 122 S.Ct. 587, 592–93, 151 L.Ed.2d 497 (2001).[10]

The degree of individualized suspicion required of a search is a determination of when there is a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable.

*Id.* at 121, 122 S.Ct. at 592. The trial court found that Appellant's earlier presence at 408 Peonia Road, a place where manufacturing and selling methamphet-

amine was suspected, and his being in the company of two persons suspected of manufacturing and selling methamphetamine, satisfied this test. However, Lee did not testify that he knew why Willen was seeking a search warrant, much less what illegal conduct had been alleged by a confidential informant (or even that there was a confidential informant). Since Willen did not testify at the suppression hearing, the trial court's finding was mere speculation—and was ultimately belied by Willen's subsequent avowal testimony at trial that he asked Lee to stop the vehicle so that he could execute the search warrant.

▮▮▮▮ But even if it were otherwise, the fruits of even a consensual search must be suppressed if the search was conducted pursuant to an unlawful stop or detention. *United States v. Chavez–Villarreal*, 3 F.3d 124, 127 (5th Cir.1993) ("Consent to search may, but does not necessarily, dissipate the taint of a fourth amendment violation."); *United States v. Recalde*, 761 F.2d 1448, 1457–58 (10th Cir.1985), *overruled on other grounds as recognized by State v. Solano*, 187 Ariz. 512, 930 P.2d 1315, 1321 (1996); *State v. Miller*, 894 S.W.2d 649, 654–56 (Mo.1995) (en banc); *cf. Rawlings v. Kentucky*, 448 U.S. 98, 106, 100 S.Ct. 2556, 2562, 65 L.Ed.2d 633 (1980) (exclusion of evidence obtained during illegal detention is inadmissible only if the evidence was obtained as a result of the illegal detention). Obviously, the evidence on which Appellant was convicted was obtained as a result of the stop that was

---

10. Because "reasonable suspicion" was found to exist in *Knights*, the Court did not specifically decide whether the probation condition operated to so diminish, or completely eliminate, the probationer's expectation of privacy that reasonable suspicion was not required. *Knights*, 534 U.S. at 120 n. 6, 122 S.Ct. at 592 n. 6. However, all but one of the United States Circuit Courts of Appeals that have considered the issue since *Knights* have held that reasonable suspicion is required. *Nicholas v.*

*Goord*, 430 F.3d 652, 665 (2d Cir.2005); *United States v. Williams*, 417 F.3d 373, 376 n. 2 (3d Cir.2005); *United States v. Comrie*, 136 Fed.Appx. 883, 893 (6th Cir.2005); *United States v. Keith*, 375 F.3d 346, 350 (5th Cir. 2004); *United States v. Tucker*, 305 F.3d 1193, 1200 (10th Cir.2002); *cf. Motley v. Parks*, 383 F.3d 1058, 1064 n. 5 (9th Cir.2004) (suggesting that reasonable suspicion is required); *contra United States v. Barnett*, 415 F.3d 690, 692–93 (7th Cir.2005).

made to facilitate the execution of the search warrant on Blakeman's residence. The issue becomes whether that stop was a lawful detention.

> Search warrants are not directed at persons; they authorize the search of "place[s]" and the seizure of "things," and as a constitutional matter they need not even name the person from whom things will be seized.

*Zurcher v. Stanford Daily,* 436 U.S. 547, 555, 98 S.Ct. 1970, 1976, 56 L.Ed.2d 525 (1978). Subject to a limited exception, a warrant to search premises does not authorize the off-premises detention of the owner or occupant of the premises to be searched. *United States v. Tate,* 694 F.2d 1217, 1223 (9th Cir.1982), *vacated on other grounds,* 468 U.S. 1206, 104 S.Ct. 3575, 82 L.Ed.2d 873 (1984). The facts in *Tate* are almost identical to those in the case *sub judice.* In *Tate,* as here, the officers were conducting a surveillance of a residence while awaiting the issuance of a search warrant to search the premises. A group of men came out of the residence, entered a station wagon, and departed. One of the officers followed the station wagon. Upon learning that the search warrant had been signed, the officer stopped the station wagon approximately five miles from the residence and ordered the occupants out of the vehicle, whereupon he detected the strong odor of ether emanating from the vehicle and some white powder residue on the person of each of the vehicle's occupants. *Id.* at 1219. *Tate* held that the warrant to search the residence did not authorize the stop of the station wagon and that the evidence obtained as a result of the stop should have been suppressed.

> Miller testified that he stopped the vehicle in order to serve the defendants with the search warrant for the Avenue

320 residence. . . . The warrant did not describe the station wagon or any other vehicle as an area to be searched. The execution of a search warrant does not require that it be served on the owner or occupant of the premises to be searched. This was not a warrant of arrest and a search warrant does not authorize the arrest of any persons associated with the premises to be searched, when neither on nor near the premises, for the purpose of conveying them to the scene of the search. *Cf. Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) (police may detain person in the act of leaving premises where police have a proper warrant to search premises for contraband).

*Id.* at 1223.

The case cited by *Tate, Michigan v. Summers,* carved out a narrow exception to this rule. In *Summers,* the officers were in possession of a warrant to search a house and were about to execute it when they encountered the owner/occupant descending the front steps. They detained him while they searched the premises and, after finding narcotics in the basement, arrested him, searched his person, and found more narcotics on his person.[11] The Court first noted the general rule:

> The State attempts to justify the eventual search of respondent's person *by arguing that the authority to search premises granted by the warrant implicitly included the authority to search persons on those premises,* just as that authority included an authorization to search furniture and containers in which the particular things described might be concealed. But as the Michigan Court of Appeals correctly noted, even if otherwise acceptable, *this argument could*

---

11. Note that the defendant was neither arrested nor searched until after the narcotics were found in the basement of the residence that was the subject of the search warrant.

*not justify the initial detention of respondent outside the premises described in the warrant .... * If that detention was permissible, there is no need to reach the question whether a search warrant for premises includes the right to search persons found there, because when the police searched respondent, they had probable cause to arrest him and had done so. Our appraisal of the validity of the search of respondent's person therefore depends upon a determination whether the officers had the authority to require him to re-enter the house and to remain there while they conducted their search.

*Michigan v. Summers*, 452 U.S. 692, 694–95, 101 S.Ct. 2587, 2590, 69 L.Ed.2d 340 (1981) (footnotes omitted) (emphasis added). In holding that the detention was lawful, *Summers* articulated a three-part balancing test:

In assessing the justification for the detention of an occupant of premises being searched for contraband pursuant to a valid warrant, both the law enforcement interest and the nature of the "articulable facts" supporting the detention are relevant. Most obvious is the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found. Less obvious, but sometimes of greater importance, is the interest in minimizing the risk of harm to the officers. Although no special danger to the police is suggested by the evidence in this record, the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence. The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation. Finally, the orderly completion of the search may be facilitated if the occupants of the premises are present. Their self-interest may induce them to open locked doors or locked containers to avoid the use of force that is not only damaging to property but may also delay the completion of the task at hand.

*Id.* at 702–03, 101 S.Ct. at 2594 (footnote and citation omitted).

Applying the *Summers* reasoning, lower courts have upheld off-premises detentions of owner/occupants of premises for which search warrants have been issued only when the owner/occupant was in close proximity to the premises to be searched. *United States v. Cochran*, 939 F.2d 337, 339 (6th Cir.1991) (upholding seizure of person "a short distance" from his residence under *Summers* where officer in possession of warrant observed defendant drive off in his car and engaged in immediate pursuit); *State v. Ailport*, 413 N.W.2d 140, 144 (Minn.Ct.App.1987) (upholding detention of suspect who drove into motel parking lot at same time officers were about to execute search warrant for room he had reserved). However, where the owner/occupant was not in close proximity to the premises, the detention has been held unlawful under *Summers*. *See United States v. Sherrill*, 27 F.3d 344, 346 (8th Cir.1994) (detention occurring one block away from premises); *United States v. Hogan*, 25 F.3d 690, 693 (8th Cir.1994) (seizure of defendant's car and person three-to-five miles from premises); *United States v. Boyd*, 696 F.2d 63, 65 n. 2 (8th Cir.1982) (noting that *Summers* "certainly did not sanction the search and seizure of residents who, at the time of the search, are several blocks from their home"); *State v. Ruoho*, 685 N.W.2d 451, 460 (Minn.Ct.App.2004) (detention occurred one-half mile from premises described in search warrant).

For purposes of stop and detention, courts have applied the *Summers* exception even when the search warrant authorizes search of both the premises and the owner/occupant. Thus, it was held in *State v. Thomas,* 603 So.2d 1382, 1383–84 (Fla.Dist.Ct.App.1992), that a suspect was properly detained under *Summers* because he was approaching the house being searched; and in *Fromm v. State,* 96 Md. App. 249, 624 A.2d 1296, 1299 (1993), it was held that detention of the suspect named in the search warrant was proper under *Summers* where the suspect walked out of a neighboring apartment building just as his residence was about to be searched. If a suspect named in a search warrant could be detained and searched wherever the suspect might be found, there would be no need to apply the *Summers* exception to such a person.

■■■ A warrant to search only an owner/occupant's premises does not necessarily authorize a search of the owner/occupant even if found on the premises. *Summers,* 452 U.S. at 695 n. 4, 101 S.Ct. at 2590 n. 4 (although occupant of premises may be detained during search of premises, search of persons on the premises would be subject to principles enunciated in *Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979)); *United States v. Micheli,* 487 F.2d 429, 431 (1st Cir.1973) ("A search of clothing currently worn is plainly within the ambit of a personal search and outside the scope of a warrant to search the premises."). For that reason, a warrant, such as the one issued here, will often authorize a search of both the premises and the owner/occupant, to prevent the owner/occupant from attempting to conceal on his or her person evidence properly seizable from the premises. However, because such warrants focus primarily on activities related to the premises, they are generally regarded as not authorizing an off-premises search of the named owner/occupant. *Commonwealth v. Santiago,* 410 Mass. 737, 575 N.E.2d 350, 352–53 (1991) ("[I]n the Commonwealth's view, the search of the defendant's person could have taken place whenever and wherever the defendant was found—on a public street, at a place of business, or in someone else's home— and was not necessarily tied to the search of the apartment. We have never construed a warrant's authorization to search a person so broadly ...."); *People v. Green,* 33 N.Y.2d 496, 354 N.Y.S.2d 933, 310 N.E.2d 533, 534 (1974) (warrant that provided for search of apartment, the person of the defendant, "and any other person who may be found therein" did not authorize search of defendant nineteen blocks from apartment, because thrust of warrant was for search of apartment and only toward the defendant insofar as he was found on the premises); *People v. Kerrigan,* 49 A.D.2d 857, 374 N.Y.S.2d 22, 23 (N.Y.App.Div.1975) (warrant to search both florist shop where gambling operations were suspected and defendant who frequented the shop did not authorize search of defendant on the street a quarter of a mile away from the florist shop).

■■■ The thrust of the search warrant in this case was the premises at 408 Peonia Road. The information obtained from the confidential informant was that Blakeman and Morris would be "at 408 Peonia Rd. selling methamphetamine that the two manufactured earlier this date." The warrant authorized a search of the "premises known and numbered as the Doug Blakeman residence at: 408 Peonia Rd, Clarkson, Ky. 42726," any vehicle registered to Blakeman or Morris, "or any vehicle *on the property* at the time this search warrant is executed" (emphasis added), and/or Blakeman or Morris. Since the warrant authorized seizure not only of metham-

phetamine but also of chemicals and equipment used in the manufacture of methamphetamine, the district judge who issued the warrant obviously had probable cause to believe that the methamphetamine to be sold on the premises had also been manufactured on the same premises.[12] In fact, Willen told Lee only that he was attempting to obtain a search warrant for 408 Peonia Road and for Willen to determine whether Blakeman and Morris were present at that location. Clearly, the purpose of the warrant was to authorize a search of both the premises and those persons suspected of conducting illegal activity on the premises. The warrant did not authorize the arrest and search of Blakeman and Morris five miles away from the searchable premises.

Nor could the facts of this case fall within the *Summers* exception authorizing detention of the owner/occupant during the conduct of the search. Blakeman and Morris were not flight risks because they had no way of knowing that the warrant had been issued—they had already departed the residence before the warrant was issued. And, because of their absence, they posed no danger to the officers conducting the search. *United States v. Edwards,* 103 F.3d 90, 93–94 (10th Cir.1996) (where defendant was unaware that warrant was being executed, stop and detention of defendant after he drove away from premises to be searched not justified under *Summers* ); *Sherrill,* 27 F.3d at 346 ("officers had no interest in preventing flight or minimizing the search's risk because [suspect] had left the area of the search and was unaware of the warrant");

*Hogan,* 25 F.3d at 693 (seizure not justified under *Summers* when defendant was unaware that search was about to be conducted); *Ruoho,* 685 N.W.2d at 460 (same). Finally, the mere presence of Blakeman and Morris was unnecessary to facilitate an orderly completion of the search. If Blakeman's father and brother were on the premises, they could have facilitated a peaceable entry into the mobile home; if not, assuming no response to a "knock and announce," *Adcock v. Commonwealth,* 967 S.W.2d 6 (Ky.1998), the warrant authorized the officers to enter the premises by force. *Michigan v. Tyler,* 436 U.S. 499, 513, 98 S.Ct. 1942, 1952, 56 L.Ed.2d 486 (1978) (Stevens, J., concurring in part and concurring in the judgment) ("A warrant provides authority for an ... immediate entry and search. No notice is given when an application for a warrant is made and no notice precedes its execution; when issued, it authorizes entry by force."). Because Lee's initial stop of Appellant's vehicle was unlawful, the evidence obtained as a result thereof should have been suppressed as the "fruit of the poisonous tree." *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963).

The Commonwealth urges us to "save" this evidence by applying the "good faith" exception to the exclusionary rule established in *United States v. Leon,* 468 U.S. 897, 922, 104 S.Ct. 3405, 3420, 82 L.Ed.2d 677 (1984), and adopted for Kentucky in *Crayton v. Commonwealth,* 846 S.W.2d 684, 686 (Ky.1992). However, the "good faith" exception applies to evidence obtained under an invalid warrant where

---

**12.** The return on the execution of the warrant shows that Detective Willen seized the following property pursuant to the warrant: "2 cans Polar starting fluid; funnel; foil; bong; roller; cell-tech; 2 brass fittings; black box with paraphernalia; cast iron elbow; baggies; liquid fire; salt; coffee filters; stats; light-

ers." Since only the two cans of starting fluid were found during the search of Appellant's wife's vehicle, the remaining items must have been found at Blakeman's residence during a subsequent search. Note that the return did not identify the flashlight and batteries as evidence seized pursuant to the warrant.

error was made by a detached and neutral magistrate and the officers relied in good faith on the validity of the warrant. *Dixon v. Commonwealth,* 890 S.W.2d 629, 632 (Ky.App.1994). The exclusionary rule is designed to deter police misconduct, *Leon,* 468 U.S. at 916, 104 S.Ct. at 3417, and "[p]enalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." *Id.* at 921, 104 S.Ct. at 3419. Here, the warrant was valid; it simply was improperly executed. The "good faith" exception will not save an improperly executed search warrant. *Id.* at 918 n. 19, 104 S.Ct. at 3418 n. 19 ("Our discussion of the deterrent effect of excluding evidence obtained in reasonable reliance on a subsequently invalidated warrant assumes, of course, that the officers properly executed the warrant and searched only those places and for those objects that it was reasonable to believe were covered by the warrant.").

"Fourth Amendment violations relating to execution of the warrant are unaffected by *Leon,* as is reflected by the majority's caution that its discussion 'assumes, of course, that the officers properly executed the warrant and searched only those places and for those objects that it was reasonable to believe were covered by the warrant.' Accordingly, *Leon* cannot be invoked in the prosecution's favor on such issues as whether the warrant was executed in a timely fashion, whether entry without prior notice of authority and purpose to execute the warrant was permissible (when not authorized by the warrant itself), *whether certain persons were properly detained or searched incident to execution of the warrant,* whether the scope and intensity and duration of the warrant execution were excessive, and whether certain items not named in the warrant were properly seized."

*United States v. Medlin,* 798 F.2d 407, 410 (10th Cir.1986) (emphasis added) (quoting Wayne R. LaFave, *"The Seductive Call of Expediency": United States v. Leon, Its Rationale and Ramifications,* 1984 U. III. L.Rev. 895, 915–16 (1984)). "It is incumbent on the officer executing a search warrant to ensure the search is lawfully authorized and lawfully conducted." *Groh v. Ramirez,* 540 U.S. 551, 563, 124 S.Ct. 1284, 1293, 157 L.Ed.2d 1068 (2004). The only evidence supporting Appellant's conviction of manufacturing methamphetamine was obtained as a result of the unlawful search of the vehicle. There being no other evidence to support the conviction, it and the sentence imposed therefor must be vacated.

Accordingly, the judgments of conviction and sentences imposed by the Grayson Circuit Court are vacated.

LAMBERT, C.J.; GRAVES, JOHNSTONE, and ROACH, JJ., concur.

WINTERSHEIMER, J., dissents by separate opinion, with SCOTT, J., joining that dissent.

Dissenting opinion by Justice WINTERSHEIMER.

I respectfully dissent from the majority opinion and would affirm the conviction in all respects for the following reasons.

## I. Double Jeopardy

In this situation there are two separate crimes charged, manufacturing in violation of KRS 218A.1432 and possession of anhydrous ammonia not in a proper container in violation of KRS 250.489. These are distinct crimes, each containing an element that the other does not. It should be remembered that KRS 250.489 describes the crime of knowingly possessing anhydrous ammonia in a container other than

an approved container as a class D offense and it may be enhanced to possibly a class A felony by virtue of KRS 250.991. Here, the prosecution proved that Parks possessed the unlawfully contained material with the intent to manufacture methamphetamine. Consequently, the enhancement provision of KRS 250.991 was proper.

Anhydrous ammonia is used for purposes other than manufacturing methamphetamine. It is of its own virtue a regulated substance because it is highly hazardous. *See, e.g.,* 29 CFR 1910.119. Accordingly, KRS 250.489 punishes such careless possession because it endangers public safety to improperly store and transport such a highly hazardous material. *See, generally,* KRS 205.482, *et seq.* Moreover, KRS 250.489 is a separate offense to KRS 218A.1432 because possessing anhydrous ammonia in an approved container does not cause a violation of KRS 250.489. Accordingly, one can violate KRS 218A.1432 by manufacturing methamphetamine but not incur violation of KRS 250.489 if the container in which the anhydrous ammonia is kept is approved.

KRS 250.489 contains an element which KRS 218A.1432 does not, that is, possession of anhydrous ammonia in a container other than an approved container. There is no such element of proof within the description of manufacturing methamphetamine. KRS 218A.1432 contains an intent element not present among the elements in KRS 250.489. Accordingly, there is no double jeopardy prohibition for prosecuting a criminal defendant for both crimes. *See Commonwealth v. Burge,* 947 S.W.2d 805 (Ky.1996), which follows the double jeopardy analysis of *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). This Court found no double jeopardy bar in regard to similar arguments in *Kotila v. Commonwealth,* 114 S.W.3d 226 (Ky.2003), *cert. denied, Kotila v. Kentucky,* 540 U.S. 1198, 124 S.Ct. 1456, 158 L.Ed.2d 114 (2004).

## II. Search

At the time the police stopped the vehicle being driven by Parks, he was on probation and had signed a waiver of rights subjecting him to any and all searches. When the police stopped the vehicle driven by Parks, a warrant had been issued for the search of the residence of his two companions, Blakeman and Morris. It authorized a search of the trailer and all vehicles located on the premises. Although the warrant had not yet been served, the vehicle was seen leaving the residence and was followed by police. The two men for whom the warrant authorized the search were inside of the automobile.

The waiver in question stated in pertinent part:

I, the undersigned, have been informed by my attorney, Phillip Smith, of my Fourth Amendment Right not to have a search of, or seizure of my property owned by me or in my care, custody and control without a valid search warrant . . . .

That for and in consideration at least in part, of receiving probation, I hereby willingly give my permission to any properly identified law enforcement officer to conduct a complete search of me, my residence and my premises[,] including vehicles, buildings, and containers, under my care, custody and control. Additionally, I willingly consent for these officers to seize anything they desire as evidence for criminal prosecution.

The waiver also indicated that Parks had consulted with his attorney before signing the waiver. It also provided that Parks would willingly agree to remain drug-free while on probation and not asso-

ciate with other drug users or sellers. The trial judge determined that the waiver began at the time probation began in January 2001, and continued for the five-year period of probation, which meant it was in effect when the stop occurred in 2002, as well as when he was tried in 2003.

The stop of the vehicle was reasonable as an investigatory stop pursuant to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and *Taylor v. Commonwealth*, 987 S.W.2d 302 (Ky.1998), because there was a reasonable suspicion that a subject is involved or about to become involved in some criminal activity. Parks had signed a waiver in exchange for probation. The authorities cited by Parks are unconvincing and not applicable, particularly in view of the bargain and informed waiver. *Cf. United States v. Knights*, 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001), which deals with a similar but not identical issue. Here, police had a reasonable, independent basis for suspicion in which to make the investigatory stop.

### III. Police Testimony

Parks argues that the trial judge committed prejudicial error by allowing evidence to be introduced against him through the testimony of Elizabethtown police sergeant Edwards. Parks claims that the officer was never offered as an expert, but was allowed to testify as if he were an expert for approximately three minutes without any objection from the defense. The officer's qualifications were subject to direct examination and disclosed that he had 16 years experience in narcotics investigation field; was specifically trained in methods of methamphetamine manufacture; originally took courses in this area in 1987; trained under the federal Drug Enforcement Agency as to clandestine labs, and later took an advanced course in the same subject. He testified that he had been involved in the investigation of hundreds of labs since 1987, and that he was certified to investigate clandestine labs and that such certification was required because of the hazardous material involved. He described anhydrous ammonia as one such material.

*Sargent v. Commonwealth*, 813 S.W.2d 801 (Ky.1991), permitted a police witness who is qualified by training and experience to testify in such a situation. *See also United States v. Bender*, 265 F.3d 464 (6th Cir.2001); *United States v. Quinn*, 230 F.3d 862 (6th Cir.2000); *United States v. Thomas*, 74 F.3d 676 (6th Cir.1996). These cases support the principle that a police officer, by virtue of his job, training and experience, can in certain instances assist a jury to understand aspects of the drug trade that the average lay juror would not be able to comprehend. It should be understood that the first mention of the process of manufacture was introduced by the defense cross-examination of a prior police witness.

Parks also complains of prejudicial testimony presented by codefendant Morris who Parks claims was "allowed to impeach his own testimony." The prosecution had uncovered certain facts about prior statements by Morris to police and was attempting to ensure that the trial testimony was consistent and accurate. Originally, the trial judge in chambers had warned the witness not to lie and the trial judge repeated that warning during the open-court testimony of the witness. There is no evidence of any kind of collusion by either the prosecutor or the trial judge that even suggests a conspiracy to intimidate the witness or to prejudice Parks. The witness testified under oath with subject cross-examination and was not impeached.

### IV. Limitation on Cross–Examination

Parks alleges a denial of his right to cross-examine a police officer concerning a search warrant as a *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) violation. At trial, defense counsel asked Officer Willen on cross-examination why he stopped Parks' car. The Commonwealth objected and a bench conference followed. Defense counsel told the trial judge that he wanted to show that the police were looking for two men but not for Parks. The judge sustained the objection but permitted the defense to enter the questioned testimony by means of an avowal. During the in-chambers testimony, the officer stated that he stopped the vehicle because it had just left the premises for which the search warrant had been issued. Two individuals other than Parks were named in the search warrant. The trial judge ruled that the testimony was not relevant because he had already determined that the stop and search of a probationer was lawful. The judge reasoned that opening this line of questions could lead to redirect examination about the affidavit supporting the warrant which indicated that two codefendants were waiting at the premises for a third person who would supply them with the illegal ingredients. The judge reasoned that this would lead to a prejudicial inference going to the jury that the third party must have been Parks because it was his vehicle. Defense counsel did not pursue any future questioning following the explanation given by the trial judge.

The requirements of *Davis v. Alaska* were not compromised. In this case, Parks sought to explore a relatively extraneous matter concerning the search warrant. The warrant did not apply to Parks directly. He had every opportunity to cross-examine the two codefendants and did not choose to do so. The trial judge correctly exercised judicial discretion in preventing the defense from going into extraneous material. *Cf. Commonwealth v. Maddox,* 955 S.W.2d 718 (1997); KRE 611.

### V. Sentencing Information

Parks argues that the jury was given legally and factually inaccurate information regarding the potential sentencing range available during the penalty phase, and thus a new penalty phase should be conducted. It is admitted that this sentence was not properly preserved for appellate review by contemporaneous objection, but that it should be considered pursuant to RCr 10.26. The trial judge combined the penalty phase instructions on one jury form and the instructions did allow the jury to consider a non-enhanced sentence of between ten and twenty years. The combined instructions stated:

A. If you find the Defendant NOT GUILTY of being a Persistent Felony Offender, based on the evidence you heard throughout this trial you shall now fix his punishment for the offense of Manufacturing Methamphetamine at confinement in the Penitentiary for a period of not less than ten (10) nor more than twenty (20) years, in your discretion.

B. If you find the Defendant guilty of being a Persistent Felony Offender, Second Degree you shall so state in your verdict and fix his punishment for the offense of Manufacturing Methamphetamine at confinement in the penitentiary for a period of not less than twenty (20) years, nor more than Life, in your discretion.

Parks complains that the jury was not permitted to fix any punishment on the underlying offenses before proceeding to whether or not he was proved to have a persistent felony offender status.

Although the instructions consolidated the PFO and non-PFO offenses, the jury was properly instructed to consider each one separately. They were first instructed to assess a non-enhanced sentence if PFO did not apply. The result was to achieve a verdict that properly reflected that they found the defendant guilty of each charge, had found him guilty of a PFO second degree, and then they imposed a sentence.

There was never a contemporaneous objection. In fact the prosecutor asked the trial judge as to whether the penalty phase should be trifurcated and the defense counsel stated that it was no longer necessary. Certainly the alleged error was unpreserved, waived and also harmless.

Considering the instructions as a whole, it is clear that the jury decided upon a sentence of twenty years, or the upper limit for each of the two non-enhanced counts and then, after enhancement, left the sentence at twenty years or the minimum sentence after enhancement was considered.

It is true that the verdict sheet expressly stating non-enhanced sentence was not issued. However, we consider this error, if any, to be procedural, and in the absence of a contemporaneous objection, it can be determined to be harmless. *See Montgomery v. Commonwealth,* 819 S.W.2d 713 (Ky.1991). As such there was no violation of the substantial rights of the defendant.

The failure of the trial judge to follow the precise language of KRS 532.110(1)(c), in the sentencing instruction is based on speculation. The question of whether the aggregate consecutive terms would exceed 70 years is not met in this case. Parks can only speculate that if the jury had been specifically instructed on the 70 year rule, it would have recommended concurrent sentences. The better way to determine sentencing error under a palpable error review is to test for prejudice. In this matter, there was none. The sentence was 30 years below the 70 year cap and the sentence for each of the two crimes was the minimum. Thus, there was no prejudice and the failure to specify the 70 year cap is harmless if error at all.

VI. Sufficiency of Evidence

This case was prosecuted for a violation of KRS 218A.1432(1)(b). In this matter no specific foundation regarding the materials required to make methamphetamine was made at trial. The issue raised on appeal differs from the issue raised at trial and is not properly preserved for appellate review.

At trial, the two codefendants testified that each one of the three individuals knew that the items were intended to manufacture methamphetamine. The trial judge correctly overruled the motion for directed verdict. In this appeal, Parks argues that the Commonwealth failed to demonstrate that either all of the chemicals or all of the equipment used for the production of methamphetamine were found in his possession. This is a different approach than was used in the trial and is expressly condemned as such a practice in *Henson v. Commonwealth,* 20 S.W.3d 466 (Ky.1999), which follows *Kennedy v. Commonwealth,* 544 S.W.2d 219 (Ky.1976). After much judicial debate involving a variety of cases beginning with *Kotila v. Commonwealth, supra,* followed by *Fulcher v. Commonwealth,* 149 S.W.3d 363 (Ky.2004), and *Varble v. Commonwealth,* 125 S.W.3d 246 (Ky.2004), this Court has effectively overruled the *Kotila* decision in *Matheney v. Commonwealth,* 191 S.W.3d 599 (Ky.2006).

In any event in this case complicity liability removes this matter from any *Kotila* requirement. Kotila in that case was charged with manufacturing methamphetamine himself, not counseling, aiding or

assisting someone else as required by complicity liability. Here, the conduct of Parks satisfies the complicity to commit the crime of manufacturing methamphetamine. Every item enumerated by the statute is in evidence with the possible exception of glassware or jar. *Varble, supra,* upheld a conviction under KRS 128A.1432(1)(b), where all the chemicals except anhydrous ammonia and all the equipment except for a filter were present. Despite the missing materials, there was sufficient evidence to satisfy even *Kotila.* In any event, *Matheney, supra,* disposes of the *Kotila* analysis.

### VII. Instructions

There was no error in instructing the jury in this case because of the complicity aspect which would satisfy the completion of a crime. Complicity does not require the proof of each element of the underlying offense. The only similarity between this case and *Kotila* is the presence of many ingredients required in the manufacturing process. Here, there was no need for speculation by a jury as to what the ingredients were intended to be used for. Both codefendants had entered guilty pleas to complicity to manufacture and both testified against Parks that he was driving them and these ingredients to a person who would take the ingredients and manufacture the substance and give the three suppliers the processed product.

As noted in *Matheney,* the language of KRS 218A.1432(1)(b) states "the chemicals or equipment for the manufacture of methamphetamine means that one must possess two or more chemicals or items of equipment with the intent to manufacture." Such a construction is based on the common sense approach which gives the proper recognition to the conduct that is denounced by the statute.

In this case, all that is necessary is that the instructions make out a complicity case under the statute and not a *Kotila* case. *See Commonwealth v. Suttles,* 80 S.W.3d 424 (Ky.2002). Reliance on *Commonwealth v. Whitmore,* 92 S.W.3d 76 (Ky. 2002) and *Burnett v. Commonwealth,* 31 S.W.3d 878 (Ky.2000), is misplaced.

I would affirm the conviction in all respects.

SCOTT, J. joins.