NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0692n.06

No. 11-5427

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| CURTIS GORDON, | ) | **FILED** |
| | ) | ***Jun 28, 2012*** |
| CANDACE SMITH, Individually and as custodial | ) | LEONARD GREEN, Clerk |
| parent and next friend, for and on behalf of B.D., a | ) | |
| minor, | ) | |
| | ) | |
| SHANNON R. DAILEY, Individually and as parent | ) | On Appeal from the United States |
| and next friend, for and on behalf of A.D., a minor, | ) | District Court for the Western |
| | ) | District of Kentucky |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LOUISVILLE/JEFFERSON COUNTY METRO | ) | |
| GOVERNMENT, ET AL., | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

Before: BOGGS, NORRIS, and KETHLEDGE, Circuit Judges.

BOGGS, Circuit Judge. Curtis Gordon, his ex-wife, Candace Smith, and her sister, Shannon Dailey, filed various federal- and state-law claims related to the investigation and prosecution of Gordon for theft by deception and forgery.[1] The district court granted summary judgment for the defendants on all of the parties' federal claims. We affirm.

---

[1]Smith and Dailey filed claims on behalf of themselves and also on behalf of their daughters—B.D. (Smith's 12-year-old daughter) and A.D. (Dailey's 11-year-old daughter).

**I**

**A**

This case arose out of allegations of fraud made to the Public Integrity Unit of the Louisville Metro Police Department in October 2006. The allegations arose when police were called to a altercation at a housing complex. The security officer on duty hit a resident with a police baton and handcuffed him, placing him under arrest. The officer, who wore a "deputy shirt," identified himself to police as a "sheriff's department deputy." However, the police determined that he was in fact a "jailer who had been suspended or terminated." He was employed by Commonwealth Security, Inc. (CSI), a security company owned by Curtis Gordon.

After the incident, police interviewed other CSI employees who were being held out as sworn police officers and who had come forward to John Groves, the head of security at the housing complex. One, Donnie Wilson, stated that he had never even applied for a job as a police officer. However, Gordon had given him a police badge from the City of Strathmoor Village Police Department and a police shirt to wear. Wilson gave Groves the shirt and the badge, and Groves gave them to the police. Wilson told officers that when he had worked as a sworn police officer he was billed out in that capacity at $19/hour.

Debbie Bowan also spoke to police. She stated that she was a resigned reserve auxiliary Indiana police officer who did not have arrest powers in Kentucky. Despite this fact, she said Gordon assigned her work as a sworn officer.

Based on this evidence, police obtained a search warrant for Gordon's home and business.[2] The search warrant for Gordon's home named the home, six cars, and Gordon and Smith themselves. The warrant provided for searching for documents and files, including electronic files, and police uniforms or badges.

**B**

The search warrant for the home, cars and the persons of Gordon and Smith was executed on the morning of December 6, 2006.

Gordon was at work when the officers arrived at the house to search. The officer in charge of Gordon's case, Sergeant Oscar Graas, was also at Gordon's office, in order to execute the search warrant there, and was not present at the house search.

After officers arrived at the residence, but before they attempted to enter it, they observed Smith pulling out of the driveway and driving away. Officers followed her in two police cars and pulled her over "[w]ithin 10 minutes of her leaving the residence." One officer confiscated Smith's cell phone and keys. He drove Smith back to the house in his car, and a different officer drove the children, A.D. and B.D. back to the house in his car. When Smith arrived back at the house, Sergeant Jacobs stated that he "gave her a copy of the search warrant and asked her to unlock the door."[3] She did so.

---

[2]The search conducted at Gordon's business is not at issue on appeal.

[3]Smith alleged in her deposition that she asked to call her attorney at this time, but the officers refused to let her. There are no other statements in the record concerning this allegation, as

During the search, Smith and the children were asked to remain in the kitchen with an officer. B.D., one of the children, became upset and was gagging. Smith stated that B.D. "was eventually allowed to go to the bathroom," but that though "she repeatedly asked for her mother [Smith]. . . [a]ccess to her mother was originally denied." During her deposition, B.D. said that she was sick during the search because she was nervous. She stated that she told Smith she needed to go to the bathroom because she was going to be sick, but that "at first the lady wouldn't—the lady that was sitting there with us . . . wouldn't let us go." She stated that when "the lady" did let them go, she said she insisted on accompanying them. B.D. stated, "So we walked to the bathroom and the lady was just standing and watching us with the door open." No particular officer was identified as the officer who monitored the bathroom.

Smith stated that she was not allowed to answer her cell phone, though her mother was calling, for 20 minutes. Eventually, however, Smith was allowed to answer her phone, and Smith's mother was allowed to come to the front door to pick up the children. The children left the residence roughly 20 minutes after the search began.

After the girls left, Smith asked to use the bathroom again. She was told that she could only do so with a female officer present and a male officer outside the door. She also stated that she was not allowed to run water or flush the toilet. Again, no particular officer was identified as the officer who monitored the bathroom.

---

plaintiffs chose not to take depositions of any of the officers.

During the search, officers searched inside a safe in Gordon's bedroom. Sergeant Jacobs called Sergeant Graas, who was at Gordon's office with Gordon, and asked for the combination to Gordon's safe. Gordon gave them the code. In an interview with the Public Integrity Unit attached to Gordon's summary-judgment response, Graas stated that Gordon told him contemporaneous with the call that the safe contained between $5,000 and $7,000 in cash. Sergeant Butler, who helped open the safe, stated the following:

> [The safe] was opened, there was one stack of money, one band around it, it was taken out and decision [sic] was made to count it, document it and leave it at the house. Sgt. Jacobs and I had the money, there was a large picture frame on the bed, we had the money on top of that, took it out and he counted a portion of the money, I counted another portion, and I think the total was about $6590, and then there was another $700 . . . in the dresser and we photographed the piles, put it in $1000 piles, I counted out a $1000 in 20's, and there were 5, 50's and then 17 extra $20's, so I counted out $1590, he counted out $6000 or $5000.

Gordon argues that the safe contained $11,000, and that the police stole $5,000 from the safe. Smith also claimed that the safe contained several pictures of her, partially nude. She alleged that the pictures were missing after the search and that the police stole them.

As well as the thefts, Gordon also claimed in his deposition that the police drove his Corvette, ripped the door off of a Coke machine on the back patio, urinated in his toilet and did not flush it, and smoked in the house. Smith claimed that the officers tore apart Christmas presents, opened her daughter's collectible dolls, and left the house in disarray. Smith and Gordon offered a video of what they alleged to be the damage done by the search. They alleged that the damage done by the officers exceeded the scope of the warrant and unreasonably seized their property.

The police had a different account of the search, which they swore to in affidavits. They made an inventory of property they seized during the search. The list of seized property included documents, invoices, two laptop computers, receipts, bank deposit slips, three police/security jackets, and five police/security shirts. The police also photographed the home and cars before and after the search. One officer—Detective Crowell–swore in his affidavit that he "accidentally start[ed] the Corvette by pushing a button on the car," but did not drive it. The officers present at the search all signed affidavits swearing that they did not smoke in the house, did not take cash from the house, did not damage the house, and did not open any Christmas gifts or Bratz dolls.

**C**

On January 31, 2007, Sergeant Graas testified before a grand jury. Graas discussed all of the events that led to securing the search warrant and the items the officers obtained in the searches. He discussed witnesses Wilson and Bowen, as well as interviews with Groves, who had stated that "Gordon knew he was supposed to provide police officers . . . [a]nd it was his job as awarded in the contract to do backgrounds on these." Graas discussed 43 invoices found during the search of Gordon's house that had charges for "Police" at the housing complex for $19/hour. Finally, he discussed a forged letter found during the search of Gordon's business. The letter was ostensibly from D. Reynolds, Chief of the City of Strathmoor Police Department, and it stated that Don Wilson was a police officer authorized to work off duty. Reynolds told police that Wilson had never applied to the Police Department, that he had never met Wilson, and that he had never seen the letter before.

Graas stated several times that Gordon's company "has a contract" with Louisville Metro Housing Authority, stating, for example, that an agreement regarding different rates of pay for security personnel and sworn police officers "is indeed part of the contract."

Based on Graas's testimony, Gordon was indicted on 43 counts of theft by deception of over $300, KY. REV. STAT. (KRS) § 514.040(1)(a), and one count of second-degree forgery, KRS § 516.030.

Gordon was later tried by a jury and acquitted on all counts.

While Gordon was still being prosecuted, Gordon and Smith filed complaints regarding Smith's detention and the search of the residence. After Gordon was acquitted, he amended his complaint to add a claim for malicious prosecution.


**II**

Gordon, Smith (individually and on behalf of B.D., her daughter), and Dailey (individually and on behalf of A.D., her daughter) sued the defendants in Jefferson County Circuit Court, naming as defendants the following parties: Louisville/Jefferson County Metro Government, Sergeant Oscar Graas, and the ten other police officers present at the search of Gordon's house. All of the officers were sued in their official and individual capacities.

Gordon alleged that he was entitled to relief under 42 U.S.C. § 1983 because the defendants "conspir[ed] together" to deprive him of his constitutional rights. Specifically, Gordon argued that the defendants used unnecessary and excessive force in the execution of the search warrant, that the defendants unlawfully deprived him of his personal property, that the defendants damaged his

property, and that the search conducted exceeded the scope authorized by the warrant. Gordon also alleged a state-law conversion claim.

Smith and Dailey filed a separate complaint. They sued the defendants under § 1983 for unlawfully detaining Smith, B.D., and A.D.; taking Smith's personal property without justification or probable cause; intentionally damaging her property; and exceeding the scope of the search warrant. Smith and Dailey also alleged various state-law claims.

The Circuit Court consolidated the cases, and the defendants removed the case to the United States District Court for the Western District of Kentucky, basing jurisdiction on 28 U.S.C. § 1331.

After removal, Gordon filed an amended complaint adding a claim of malicious prosecution.

After discovery, the defendants moved for summary judgement. The district court granted summary judgment for the defendants on all federal claims. The court declined to exercise its discretion to decide the state-law claims based on supplemental jurisdiction. It remanded the state-law claims to Jefferson County, Kentucky, Circuit Court.

With regard to the § 1983 claims alleging theft and property damage during the search, and naming the officers in their individual capacities, the court determined that Gordon and Smith's claim failed because they did not offer any evidence to indicate which individual or individuals were responsible for the alleged theft or damage. The court noted that only officers with direct responsibility are subject to liability under § 1983, *Wilson v. Morgan*, 477 F.3d 326, 337 (6th Cir. 2007), and "conclusory allegations of officers' collective responsibility" are insufficient to survive summary judgment. *Hessel v. O'Hearn*, 977 F.2d 299, 305 (7th Cir. 1992).

With regard to Smith's and Dailey's claims of unlawful detention, the court held that officers executing a search warrant may detain individuals found on the premises, even if the individuals are not named in the warrant. *Muehler v. Mena*, 544 U.S. 93, 98, 100 n.2 (2005). The court noted that officers may also detain individuals seen leaving the premises and require them to re-enter the home and remain for the duration of the search. *Michigan v. Summers*, 452 U.S. 692, 705 (1981); *United States v. Bohannon*, 225 F.3d 615, 616 (6th Cir. 2000). The court noted that the detention of an individual leaving a residence described in a search warrant should be effected "as soon as practicable after departing [the individual's] residence." *United States v. Cochran*, 939 F.2d 337, 339 (6th Cir. 1991). Smith's detention on the highway may have been outside the "as soon as practicable" range, but the court determined that the officers were protected by qualified immunity regardless, because the law at the time of the stop did not establish a fixed radius or time frame as per se "practicable."[4]

---

[4]Circuits are split on whether it is reasonable for officers to detain residents observed leaving a residence for which officers have a valid search warrant and bring them back to the residence. The Sixth Circuit permits such stops if they are made "as soon as practicable." *Cochran*, 939 F.2d at 339. The Seventh and Fifth Circuits also hold such stops reasonable. *See United States v. Bullock*, 632 F.3d 1004, 1020 (7th Cir. 2011) (allowing the stop when "there [was] nothing to suggest that the vehicle was not pulled over as soon as practicable."); *United States v. Cavazos*, 288 F.3d 706, 711 (5th Cir. 2002). The Tenth and Eighth Circuits have held that such a stop is not reasonable. *United States v. Edwards*, 103 F.3d 90, 94 (10th Cir. 1996); *United States v. Sherrill*, 27 F.3d 344, 346 (8th Cir. 1994). The Supreme Court has granted certiorari in a similar case, and perhaps will clarify the acceptable distance for such a stop. *See United States v. Bailey*, 652 F.3d 197, 200, 204–07 (2d Cir. 2011) (holding that *Summers* permitted the traffic stop and return of residents seen leaving an apartment for which officers had a search warrant, when the traffic stop was made five minutes after residents left), *cert. granted*, No. 11-770, 2012 WL 1969365 (U.S. June 4, 2012).

Gordon's claim of malicious prosecution failed because the court determined that there was sufficient evidence to establish probable cause for Gordon's indictment even if Graas's statement that Gordon had a "contract" with the housing community was excised. *McKinley v. City of Mansfield*, 404 F.3d 418, 445 (6th Cir. 2005).

Finally, the plaintiffs' claims against Louisville/Jefferson County Metro failed because plaintiffs had offered no evidence suggesting that an "official municipal policy" caused the officers' complained-of conduct. *Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658, 691 (1978). For the same reason, the district court determined that the plaintiffs' claims against the officers in their official capacities must fail. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

Gordon, Smith, and Dailey jointly filed this timely appeal.

### III

### A

We review a district court's grant of summary judgment *de novo*. *Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 792 (6th Cir. 2009). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, "show that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). We must view the evidence in the light most favorable to plaintiffs to determine whether a genuine issue of material fact exists. *Birgel v. Bd. of Comm'rs of Butler Cnty., Ohio*, 125 F.3d 948, 950 (6th Cir. 1997). However, we need not make

inferences that amount to no more than "metaphysical doubt as to the material facts." *Masushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991) (holding that "inferences and opinions . . . must not be flights of fancy, speculations, hunches, intuitions, or rumors . . . .").

**B**

On appeal, Gordon and Smith renew all five of their federal claims. We review these claims in turn.

First, we address plaintiffs' claims that police took $5,000 and pictures of Smith from the safe. Law-enforcement activities that unreasonably damage or destroy personal property, therefore "seizing" it within the meaning of the Fourth Amendment, can give rise to liability under § 1983. *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 61–62 (1992). Each defendant's liability is assessed individually, according to his own actions. *Dorsey v. Barber*, 517 F.3d 389, 399 n.4 (6th Cir. 2008) (citing *Ghandi v. Police Dep't of Detroit*, 747 F.2d 338, 352 (6th Cir. 1984)). An officer who is "present at a scene [of a § 1983 violation] but is not directly responsible for the complained of action is entitled to qualified immunity under § 1983." *Wilson*, 477 F.3d at 337.

On appeal, Gordon argues that the district court erred in holding that Gordon's claim failed as a matter of law because he was unable to prove who allegedly stole the money or the pictures. However, the rule that a plaintiff bears the burden of establishing individual officer liability in § 1983 claims is well established in our Circuit. *See, e.g.*, *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) ("Each defendant's liability must be assessed individually based on his own actions.")

(citing *Ghandi*, 747 F.2d at 352 ("As a general rule, mere presence at the scene of a search, without a showing of direct responsibility for the action, will not subject an officer to liability [under § 1983].")).

Gordon argues that the district court ignored binding Sixth Circuit precedent he cited in his opposition to defendants' motion for summary judgment, but his precedents are not on point. *Bonds v. Cox*, 20 F.3d 697 (6th Cir. 1994), only dealt with Bonds's standing to sue, not the issue of whether he was required to establish direct responsibility for each officer. *Hill v. McIntyre*, 884 F.2d 271, 278 (6th Cir. 1989), also did not address the issue of direct responsibility for damage. Gordon is incorrect that the district court failed to apply binding Sixth Circuit precedent on the issue of direct liability. The cases he has cited do not address the issue. In fact, the bulk of Gordon's argument regarding the direct-liability issue is merely rhetorical.

Gordon has not pointed to evidence indicating that any particular officer was responsible for unreasonable seizure of his property during the search. We therefore affirm the district court's grant of summary judgment to the officers in their individual capacities.[5]

Second, we address the claims that Smith and the children were unreasonably detained during the search. Plaintiffs' claims do not withstand scrutiny.

---

[5]Gordon also claims that the district court erred when it stated that he did not properly allege a conspiracy in his complaint. However, Gordon only made a single mention of conspiracy, when he claimed that officers "conspir[ed] together to violate Plaintiff's Constitutionally protected Civil Rights." It is well-settled that plaintiffs must plead a conspiracy with particularity, and must provide more than "vague and conclusory allegations." *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003) (internal quotation marks omitted). Gordon's bare mention of conspiracy does not satisfy this standard.

The threshold inquiry in a § 1983 suit is whether there has been a constitutional or statutory violation at all, and, if so, whether the right allegedly violated was clearly established at the time of the defendant's actions. *Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 485 (6th Cir. 2007); *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). If there was no violation, or if the right was not clearly established at the time of the violation, then the officer is entitled to qualified immunity as a matter of law. *Williams*, 496 F.3d at 485. Either step can precede the other as desired. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The plaintiff bears the burden of proving that an officer is not entitled to qualified immunity. *Rodriguez v. Passinault*, 637 F.3d 675, 689 (6th Cir. 2011).

For a right to be clearly established, the "contours of the right must be sufficiently clear" that a reasonable official would understand that what he is doing violates that right. *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (internal quotation marks omitted). In determining the "contours of the right," the very action in question need not have been held unlawful, but "in the light of pre-existing law the unlawfulness must be apparent." *Ibid.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The fundamental inquiry is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001), *overruled on other grounds by Pearson*, 555 U.S. 223.

Limited or routine detention of residents pursuant to a valid search warrant is lawful. *Summers*, 452 U.S. at 705. The right has more recently been held to be "categorical." *Muehler*, 544 U.S. at 98; *see also Bletz v. Gribble*, 641 F.3d 743, 755 (6th Cir. 2011) ("[E]ven absent particularized reasonable suspicion, innocent bystanders may be temporarily detained where

necessary to secure the scene of a valid search or arrest and ensure the safety of officers and others.").

Nevertheless, while a detention is a smaller encroachment on liberty than the search itself, the detention is "admittedly a significant restraint on [the resident's] liberty." *Summers*, 452 U.S. at 701. Therefore, the manner and scope of the detention must be reasonable. *See Bletz*, 641 F.3d at 755 (it is "expected that any detention under these circumstances would be limited or routine.") (internal quotation marks omitted); *Binay v. Bettendorf*, 601 F.3d 640, 652 (6th Cir. 2010) (holding that it is "clearly established that the authority of police officers to detain the occupants of the premises during a proper search for contraband is 'limited' and that the officers are only entitled to use 'reasonable force' to effectuate such a detention.") (quoting *Summers*, 452 U.S. at 705). A determination of reasonableness hinges on "the law enforcement interest and the nature of the 'articulable facts' supporting the detention." *Summers*, 452 U.S. at 702. Preventing flight, minimizing the risk of harm to the officers, a suspicion of wrongdoing regarding the detained resident, and promoting the orderly completion of the search were the specific factors named in *Summers*, with the Court noting that residents' "self-interest may induce them to open locked doors or locked containers . . . ." *Id.* at 702–04. The Court noted that "special circumstances, or possibly a prolonged detention, might lead to a different conclusion in an unusual case . . . ." *Id.* at 705 n.21. Detentions of children have been held to "raise additional concerns[,]" *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994), but have not been held unreasonable per se.

In this case, plaintiffs have failed to put forth evidence suggesting that the officers engaged in an unreasonable detention or, if they did, that they should not be entitled to qualified immunity.

Officers brought Smith and the children to the residence so that Smith could help the officers perform the search more efficiently—for example, by letting them in the house. This is one of the justifications described in *Summers*. Moreover, Smith's person and her car were named in the search warrant; bringing them back to the residence allowed the search to be conducted more fully. Though the children were not named in the warrant, it was not unreasonable, even if it was not the ideal solution, to bring them back to the house with Smith. Moreover, because the officers were not deposed, the record contains no indication as to whether they knew if the children were going, for example, to school.

The officers kept Smith and the children in the kitchen, supervised, and required that they be accompanied to the bathroom—while this might be overly cautious, especially with regard to the children, it is not so unreasonable as to violate clearly established law. *See, e.g.*, *Dawson v. City of Seattle*, 435 F.3d 1054, 1069 (9th Cir. 2006) (holding it reasonable to accompany residents to the bathroom in a non-drug-related search); *cf. Spafford v. Romanowsky*, 348 F. Supp. 2d 40, 44–45 (S.D.N.Y. 2004) (accompanying officer had to prevent resident from locking herself in the bathroom during a search of her residence). Again, no individual officer was singled out as being responsible for particular misconduct. Therefore, while it does not seem to have been wholly necessary for the officers to detain the children, their detention was not unreasonable in scope or duration, so as to violate a clearly established right and, even if it had been, the officer responsible for such misconduct was not identified. For these reasons, we agree with the district court that Smith's and the children's detentions pursuant to the execution of the search warrant cannot defeat the qualified immunity of any individual officer.

Third, we consider the claim that the traffic stop was a violation of § 1983. The district court is correct that persons leaving a residence that is the target of a search warrant may be followed, detained and brought back to the house. *See Cochran*, 939 F.2d at 339. Merely being stopped and brought back to the house was not a violation of Smith's constitutional rights. Moreover, we agree with the district court that the exact number of minutes or miles that police may follow before detaining the individual was not clearly established at the time of the stop; therefore, the officers were protected by qualified immunity.[6] We affirm the district court's grant of summary judgment with regard to the officers' stop of Smith.

Fourth, we consider Gordon's claim of malicious prosecution. After carefully examining the record evidence, we agree with the district court that the grand jury had ample evidence on which to base a finding of probable cause for 43 counts of theft by deception and one count of forgery, even if Graas's statements about the existence of a written or otherwise formalized contract were excised. Even without evidence of a written contract, the grand jury would have had probable cause to indict Gordon. Therefore, we affirm the district court's grant of summary judgment to defendants regarding Gordon's malicious-prosecution claim.

---

[6]One Kentucky case held that a police stop of a resident who left a residence that was the subject of a valid search warrant was unreasonable. *Parks v. Commonwealth*, 192 S.W.3d 318, 331–33 (Ky. 2006). However, *Parks* is different from this case in at least one important respect. In *Parks*, the officer began following Parks before the warrant was obtained. *Id.* at 329. After the warrant was issued, the officer following the residents was notified to pull the residents over and return them to the residence. *Ibid.* The fact that Parks was "off premises" when the officers obtained the warrant was key to the court's decision that the stop was unlawful. *Id.* at 331. In our case, the officers had the search warrant while Smith was still "on premises."

- 16 -

Finally, we consider plaintiffs' claims against the county government and the officers in their official capacities. We agree with the district court that the plaintiffs did not put forth any evidence that the municipal government had a policy supporting officer misconduct. Therefore, the government cannot be held liable. For this reason, the officers also cannot be held liable in their official capacities.

**III**

For the foregoing reasons, the district court's judgment is AFFIRMED.